## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

SIDI MOUHAMED DEIDE, ADAMA SY,
ABDALLAHI SALEM, MOUHAMED SAID
MALOUM DIN, and JHONNY NEIRA on
behalf of himself and all similarly situated
people,

          Plaintiffs,

v.

EDWIN J. DAY as Rockland County Executive;
STEVEN M. NEUHAUS as Orange County
Executive,

          Defendants.

Case No. 23-cv-3954 (NSR)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

NEW YORK CIVIL LIBERTIES
  UNION FOUNDATION

AMY BELSHER
ANTONY GEMMELL
GUADALUPE V. AGUIRRE
IFEYINWA CHIKEZIE*
CHRISTOPHER DUNN
125 Broad Street, 19th Floor
New York, New York 10004
212-607-3300
abelsher@nyclu.org
agemmell@nyclu.org
laguirre@nyclu.org
ichikezie@nyclu.org
cdunn@nyclu.org

*Application for admission in the
Southern District of New York
forthcoming*

Dated: May 15, 2023
     New York, New York

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT ................................................................................................... 1

FACTS ........................................................................................................................................... 2

ARGUMENT ................................................................................................................................. 7

I.       THE PLAINTIFFS FACE IRREPARABLE HARM ABSENT AN INJUNCTION. ........ 8

II.      THE PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE
         MERITS. ...................................................................................................................... 10

         A.       The Challenged Executive Orders Violate the Plaintiffs' Due Process Rights to
                  Intrastate Travel. ............................................................................................... 10

         B.       The Challenged Executive Orders Violate the Plaintiffs' Rights to Equal
                  Protection. ......................................................................................................... 15

         C.       The Executive Orders Violate the Supremacy Clause of the United States
                  Constitution. ...................................................................................................... 21

         D.       The Executive Orders Violate the Civil Rights Act of 1866. ............................... 22

         E.       The Challenged Executive Orders Violate the Plaintiffs' Rights to Public
                  Accommodations Under Title II of the Civil Rights Act of 1964. ....................... 23

III.     THE EQUITIES WEIGH HEAVILY IN THE PLAINTIFFS' FAVOR AND A
         PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTERESt. .................. 24

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases** ....................................................................................................................Page(s)

*Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749 (9th Cir. 2019)...................25

*Anderson v. Conboy,* 156 F.3d 167 (2d Cir. 1998) ........................................................17

*Aptheker v. Secretary of State,* 378 U.S. 500 (1964) .......................................................12

*Arizona v. United States*, 567 U.S. 387 (2012)................................................................21

*Att'y Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898 (1986) ..................................................12

*Averhart v. Annucci*, No. 21-CV-383 (NSR), 2021 WL 2383556 (S.D.N.Y. June 10, 2021) ......................................................................................................................8, 24

*Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511 (1935) ......................................................15

*Brown v. City of Oneonta, New York*, 221 F.3d 329 (2d Cir. 2000)................................16, 17, 18

*Calvagno v. Bisbal*, 430 F. Supp. 2d 95 (E.D.N.Y. 2006)................................................10

*Centro Presente v. U.S. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393 (D. Mass. 2018)............18

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985) ............................15

*Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012) ...........................................................15

*Daniel v. Paul*, 395 U.S. 298 (1969)...............................................................................23

*Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017)....................................................................25

*Edwards v. California*, 314 U.S. 160 (1941) ..................................................................11

*Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351 (S.D.N.Y. 2007), *aff'd,* 308 F. App'x 511 (2d Cir. 2009) .....................................................................................13

*Graham v. Richardson*, 403 U.S. 365 (1971) .................................................................15

*Guichardo v. Langston Hughes Queens Libr.*, No. 15-CV-2866, 2015 WL 13227995 (E.D.N.Y. Nov. 20, 2015) ...............................................................................................................23

*Hamm v. City of Rock Hill*, 379 U.S. 306 (1964) ..........................................................23

*Hayden v. County of Nassau*, 180 F.3d 42 (2d Cir.1999)..............................................15

*Helio Logistics, Inc. v. Mehta*, No. 22-CV-10047, 2023 WL 1517687 (S.D.N.Y. Feb. 3, 2023) ........................................................................................................................2, 8

ii

*Hooper v. Bernalillo County Assessor,* 472 U.S. 612 (1985) .......................................................11

*In re Slater*, 200 B.R. 491 (E.D.N.Y. 1996) ............................................................................10

*Jana-Rock Const., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195 (2d Cir. 2006) ...............................................................................................................15, 16, 17

*Jeffery v. City of New York,* No. 20-CV-2843, 2022 WL 204233 (E.D.N.Y. Jan. 24, 2022) ........11

*Johnson v. California*, 543 U.S. 499 (2005) ...............................................................................16

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ............................................................................8

*King v. New Rochelle Municipal Housing Authority,* 442 F.2d 646 (2d Cir. 1971) ...............13, 14

*Lozano v. City Hazelton*, 724 F.3d 297, 313–22 (3d Cir. 2013), *cert. denied*, 571 U.S. 1237 (2014) ...............................................................................................................................21

*L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018) ..............................................................10

*Macedonia Church v. Lancaster Hotel Limited Partnership*, 560 F. Supp. 2d 175 (D. Conn. 2008) .......................................................................................................................22

*McNeil v. New York City Housing Authority*, 719 F. Supp. 233 (S.D.N.Y. 1989) .......................10

*Memorial Hospital v. Maricopa County,* 415 U.S. 250 (1974) .....................................................11

*Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) .........................................18

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984) .......................................................................24

*Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333 (2d Cir. 1974) .........................................22

*Parada v. Anoka County*, No. 21-CV-3082 (8th Cir. Nov. 30 2022) ...........................................17

*P.G. v. Jefferson Cnty., New York*, No. 5:21-CV-388, 2021 WL 4059409 (N.D.N.Y. Sept. 7, 2021) ..................................................................................................................................25

*Ramos v. Town of Vernon,* 353 F.3d 171 (2d Cir. 2003) ............................................................13

*Saenz v. Roe*, 526 U.S. 489 (1999) ..............................................................................11, 14, 15

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..............................................................18

*Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266 (S.D.N.Y. May 23, 2018) ....................24

*Shapiro v. Thompson*, 394 U.S. 618 (1969) ........................................................................11, 14

*Shaw v. Reno*, 509 U.S. 630 (1993) .........................................................................................16

*Spencer v. Casavilla,* 903 F.2d 171 (2d Cir.1990)..........................................................................10

*Streetwatch v. Nat'l R.R. Passenger Corp.*, 875 F. Supp. 1055 (S.D.N.Y. 1995) ........................11

*Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)..........................................................22

*Tellock v. Davis*, No. 02-CV-4311, 2002 WL 31433589 (E.D.N.Y. Oct. 31, 2002)....................10

*Town of Southold v. Town of E. Hampton*, 477 F.3d 38 (2d Cir. 2007) ........................................12

*Tripathy v. Lockwood*, No. 22-PR-949, 2022 WL 17751273 (2d Cir. Dec. 19, 2022)...................8

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) *cert. denied*, 569 U.S. 968
    (2013)....................................................................................................................................21

*Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926 (E.D.N.Y. May 24, 2010) ...17

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ........................17, 18

*Villas at Parkside Partners v. City of Farmers Branch, Texas,* 726 F.3d 524 (5th Cir. 2013), *cert.
    denied*, 571 U.S. 1237 (2014) ...............................................................................................21

*Washington v. Davis*, 426 U.S. 229 (1976)..................................................................................15

*Williams v. Town of Greenburgh*, 535 F.3d 71 (2d Cir. 2008).........................................10, 11, 13

*Yang v. Kosinski*, 960 F.3d 119 (2d Cir. 2020).............................................................................8

*Zobel v. Williams,* 457 U.S. 55 (1982)........................................................................................11

**Statutes, Rules and Regulations**

N.Y. Exec. Law § 24(f)...............................................................................................................20

N.Y. Exec. Law § 24 (g).............................................................................................................20

U.S. Const., Art. VI, Clause 2.....................................................................................................21

42 U.S.C. § 2000a(a)..................................................................................................................23

42 U.S.C. § 2000a(b)(1)..............................................................................................................23

# PRELIMINARY STATEMENT

This civil-rights action challenges aggressive and plainly unlawful efforts by Rockland and Orange Counties in New York to block migrants from traveling to and residing within their borders. Having welcomed tens of thousands of migrants over the last year, New York City recently made arrangements to house a small number of migrants in Rockland County and nearby Orange County. In response, the two counties immediately issued executive orders that expressly seek to bar "migrants" and "asylum seekers" from coming to the counties from New York City and that further seek to bar local hotels from making their rooms available to migrants for any period of time. In conjunction with these orders, Rockland County Executive Edwin Day and Orange County Executive Steven Neuhaus have made racist and incendiary accusations about immigrants and have threatened to deploy local law enforcement to physically block buses bringing migrants to their counties.

Attempting to justify these draconian measures, the defendants have invoked an emergency that does not exist, raising the specter of "thousands" of immigrants entering the counties and burdening social services. But, as the Supreme Court repeatedly has held, the Constitution forbids localities from attempting to exclude people based on their perceived indigence or need of government services. Every person in New York State has a fundamental right to move freely within the state irrespective of their national origin, alienage, or race. Moreover, there are no large-scale plans for migrants to move to Rockland and Orange Counties nor any immediate need for the counties to absorb the costs of caring for the limited number of migrants who do choose to do so. As the defendants' statements make plain, these justifications are mere pretext for the defendants' true motivation: excluding the plaintiffs and others because they are migrants and asylum seekers. Neither the Constitution nor the Civil Rights Act permit this explicit discrimination. Nor does the Constitution's Supremacy Clause tolerate the counties'

attempt to regulate the travel and residency of noncitizens, which is the exclusive province of the federal government.

The plaintiffs are a class of migrants and asylum seekers who are currently participating in or will participate in New York City's program that provides transportation to Rockland and Orange Counties as well as temporary lodging, meals, and social services. They seek preliminary injunctive relief that will enjoin the aggressive efforts by each county to bar the plaintiffs from relocating to or remaining in the counties. These efforts violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment, the Supremacy Clause, the Civil Rights Act of 1866, and Title II of the Civil Rights Act of 1964, and they are inflicting irreparable harm.

## FACTS

As this Court recently noted, "in deciding a motion for a preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence." *See Helio Logistics, Inc. v. Mehta*, No. 22-CV-10047, 2023 WL 1517687, at *2 (S.D.N.Y. Feb. 3, 2023) (NSR) (cleaned up).

### *New York City Welcomes Large Numbers of Migrants*

Within the past year, over 60,800 migrants have arrived in New York City. *Suburbs are Furious at Adams's Plan to Send Migrants to Their Hotels,* New York Times, May 7, 2023 (attached as Exhibit 4 to the Declaration of Amy Belsher ("Belsher Decl.")). New York City recognized the need to supplement the city's shelter system to handle the arrivals of migrants and city agencies began to establish and operate temporary "Humanitarian Emergency Relief and Response Centers" to fit this need. Press Release: Mayor Adams Announces Humanitarian Emergency Response and Relief Centers to Further Support Asylum Seekers Entering NYC, Sept. 22, 2022 (attached as Exhibit 14 to Belsher Decl.). Over the past several months, New York City has provided temporary housing, food, medical care, and case work and other social

services for over 36,738 of these migrants. Executive Order Declaring a Disaster Emergency in the State of New York, May 9, 2023 (attached as Exhibit 9 to Belsher Decl.).

The plaintiffs are a class of migrants and asylum seekers who have recently arrived in the United States. Upon arriving in New York, the named plaintiffs were living in a shelter for migrants in Brooklyn. Declaration of Lourdes Chavez (Chavez Decl.) ¶ 4. That shelter houses hundreds of people who sleep on cots in large open rooms. *Id.* ¶ 5. While there, the plaintiffs found it difficult to find privacy and, due to the constant noise, were often unable to sleep. *Id.* ¶ 6.

### *The Plaintiffs Opt into a Voluntary Relocation Program Funded by New York City*

On or around Friday, May 5, 2023, New York City Mayor Eric Adams announced a "new, voluntary program," open to the plaintiffs and other migrants located in shelters around New York City. Press Release: Mayor Adams Announces Program To Provide Shelter Option For Asylum Seekers Already In Care In Nearby New York Counties, May 5, 2023 (attached as Exhibit 12 to Belsher Decl.). Under the program, described by Mayor Adams as a way for participants to establish "connections to local communities as they build a stable life in New York State," New York City would offer transportation to Orange and Rockland Counties, where program participants would continue to receive temporary lodging, meals, and social services funded by New York City. *Id.*

To effectuate this program, New York City entered into contracts with local hotels, including the Crossroads Hotel, located in Newburgh in Orange County, and the Armoni Inn and Suites, located in Orangeburg in Rockland County. "Nearby New York Counties" Brochure (attached as Exhibit 5 to Belsher Decl.).

The named plaintiffs each opted into the program, adding their name to a list, maintained by New York City officials, of individuals who wished to participate, and to relocate from New York City. Chavez Decl. They each have a desire to relocate to either Rockland or Orange Counties at least temporarily and begin to build their new lives in the United States. *Id.*

**Orange and Rockland Counties Act to Block the Program**

In response to Mayor Adams's announcement, government officials in Orange and Rockland Counties took immediate and extraordinary steps to block the program. On May 5, 2023, Defendant Edwin Day declared a state of emergency in Rockland County "in response to the City of New York planning on housing about 340 adult males in Armoni Inn and Suites in Orangeburg for four months followed by attempted integration into the County." Rockland County Press Release, May 5, 2023 (attached as Exhibit 8 to Belsher Decl.). The emergency declaration states Rockland County "is not capable of receiving and sustaining the volume of migrants and asylum seekers that New York City intends to send over, whose presence will spike the number of people in need of government services at all levels of government in the County from Villages to Towns and School Districts . . .." Rockland County Emergency Declaration, at 2 (attached as Exhibit 2 to Belsher Decl.).

In an accompanying press release, Defendant Day claimed: "This State of Emergency prohibits other municipalities from bringing and housing people in the County and prohibits hotels and motels from housing immigrants without a license and requires any municipalities that might bring migrating or asylum-seeking people into Rockland County to ensure they will be fully cared for and paid for." Exhibit 8.

Pursuant to this claimed state of emergency, Defendant Day promulgated an executive order prohibiting "foreign municipal programs that burden the County." Rockland County

Emergency Order No. 1, May 6, 2023 ("Rockland County EO") (attached as Exhibit 3 to Belsher Decl.). The order states in relevant part that "no municipality may make contracts with persons, businesses, or entities doing business within the County to transport migrants or asylum seekers to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive." *Id*. The order further prohibits any "hotel, motel, or owner of a multiple dwelling in Rockland County" from "contract[ing] or otherwise engage in business with any other municipality other than the County of Rockland for the purpose of providing housing or accommodations for migrants or asylum seekers without a license granted by the County." *Id*.

In discussing the Rockland County Executive Order, Executive Day used racially-coded language to describe the migrants and asylum seekers seeking to participate in the NYC program, the impact of migrants and asylum seekers entering and residing within Rockland County, and to otherwise condemn the NYC plan. Emma James, *NY GOP Lawmaker Threatens to Grab NYC Mayor Eric Adams by the THROAT*, Daily Mail, May 8, 2023 (attached as Exhibit 7 to Belsher Decl.); Facebook posts by Defendant Day (attached as Exhibit 19 to Belsher Decl.).

On Monday, May 8, 2023, Defendant Neuhaus issued an executive order declaring a state of emergency in Orange County "in response to New York City's proposed plan to send asylum seekers to be temporarily housed at motels in the Town of Newburgh." Orange County Executive Order ("Orange County EO") (attached as Exhibit 1 to Belsher Decl.).

As justification for the claimed emergency, the order provides "there is reasonable apprehension of immediate danger of public emergency of potentially thousands of persons being transported to Orange County" and that Orange County "is not capable of receiving and sustaining such volume of migrants and asylum seekers." *Id.* While predicting that Orange

County's restrictions on housing "will result in large-scale homelessness for these migrants and asylum seekers," the executive order prohibits "all hotels, motels and/or any facilities allowing short-term rentals" from "accept[ing] said migrants and/or asylum seekers for housing within Orange County." *Id.*

In repeated public addresses related to the issuance of the Orange County order, Defendant Neuhaus used racially-coded language to describe the migrants and asylum seekers seeking to participate in the NYC program, the impact of migrants and asylum seekers entering and residing within Orange County, and to otherwise condemn the NYC plan. Ben Nandy and Bob Doda, *Orange County Declares State of Emergency in Response to NYC Plan to Bus Asylum Seekers to Newburgh*, News 12 Westchester (attached as Exhibit 6 to Belsher Decl.); Facebook video posted by Defendant Neuhaus on May 9, 2023 (attached as Exhibit 16 to Belsher Decl.).

There is every reason to believe the defendants will execute and enforce their executive orders. Since the issuance of the Orange County order, Defendant Neuhaus has declined to rule out fining hotels that violate the order, evicting migrants housed in those hotels, and directing county law enforcement to force buses transporting migrants into Orange County to leave. Soon after issuing the executive order, Defendant Neuhaus threatened to intercept migrants attempting to locate to Orange County and expressed his plans to renew the order upon its expiration, warning: "I think we're going to have a standoff in the next 24 to 48 hours." Katelyn Cordero, *NYC suburbs vow 'standoff' over Adams sending migrants there*, POLITICO, May 10, 2023 (attached as Exhibit 11 to Belsher Decl.); Blaise Gomez, *This issue is going to get worse.' Officials warn immigration crisis far from over in the Hudson Valley, despite state of emergencies*, News 12 Westchester, May 9, 2023 (attached as Exhibit 18 to Belsher Decl.). Along with issuing the Rockland County executive order, Defendant Day deployed law

enforcement across the county and threatened to impose legal penalties on migrants and those who assist them in entering and residing in Rockland County, though a spokesperson later retracted the threats of legal penalties directed towards migrants. Dana Rubinstein, Luis Ferré-Sadurní and Jeffery C. Mays, *New York Leaders Spar Over Adams's Plan to Move Migrants From the City*, The New York Times, May 11, 2023 (attached as Exhibit 17 to Belsher Decl.); Exhibit 7.

### *Governor Hochul Declares a State of Emergency*

On May 9, 2023, New York Governor Hochul declared a state of emergency due to "the arrival of increased numbers of migrants seeking shelter" in New York City and State. Exhibit 9. As of May 11, 2023, the policy along the southern border changed and New York City officials expect several thousand people to be arriving in New York each week. *Id*. New York City has stated that the city's shelter system is operating beyond its capacity, claiming to suspend rules governing the right to shelter in the city. Emma G. Fitzsimmons and Andy Newman, *Adams Weakens Right-to-Shelter Rules, Anticipating Migrant Surge*, The New York Times, May 10, 2023 (attached as Exhibit 13 to Belsher Decl.). Governor Hochul's directive authorizes agencies and the Red Cross "to assist affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety." Exhibit 9. The order also suspends certain state laws governing contracts, purchasing rules, and real property which will allow the state to buy goods and lease buildings, and enable additional spaces to be used to shelter migrants throughout the state. *Id.*

### ARGUMENT

The plaintiffs seek preliminary injunctive relief enjoining the defendants from enforcing their emergency executive orders targeting migrants and asylum seekers. As this Court has noted, to obtain a preliminary injunction, the movant must demonstrate: "(1) a likelihood of

success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Helio Logistics, Inc.*, No. 22-CV-10047 (NSR) at *2 (S.D.N.Y. Feb. 3, 2023) (cleaned up).

The plaintiffs are entitled to that interim relief here. They can make a strong showing that the defendants' executive orders will subject them to irreparable—indeed, devastating—harm. They are likely to succeed on their claims that the challenged orders violate their rights to due process, equal protection, and to access places of public accommodation. And the public interest and balance of equities weigh heavily in their favor.

## I. THE PLAINTIFFS FACE IRREPARABLE HARM ABSENT AN INJUNCTION.

The plaintiffs will suffer irreparable harm absent preliminary injunctive relief. As discussed in detail below, the defendants' actions violate the plaintiffs' constitutional rights under the Fourteenth Amendment. As the Second Circuit recently noted, "a presumption of irreparable injury flows from a violation of constitutional rights." *See Tripathy v. Lockwood*, No. 22-PR-949, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022) (cleaned up); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). And as this Court recently noted, the Second Circuit has recognized the alleged violation of constitutional rights, including the Fourteenth Amendment, is sufficient to establish irreparable injury. *Averhart v. Annucci*, No. 21-CV-383 (NSR), 2021 WL 2383556, at *9 (S.D.N.Y. June 10, 2021) (citing *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020)). In light of this precedent, this Court too has held that an alleged violation of a plaintiff's Fourteenth Amendment rights "is sufficient to establish irreparable harm as a matter of law." *Id*.

Here, the plaintiffs already have experienced harm resulting from the executive orders. The Counties have relied on the orders to prevent them, among other migrants and asylum seekers, from relocating to their counties. Exhibits 1 and 3. The plaintiffs who have relocated to Orange County are at risk of eviction from the hotels in which they are residing. Because these blatant and ongoing efforts to exclude migrants from Rockland and Orange Counties violates the plaintiffs' rights under the Fourteenth Amendment and the Civil Rights Act, *see infra*, they are sufficient to show irreparable harm as a matter of law.

And these constitutional violations are not mere abstractions. The plaintiffs are recent arrivals to the United States seeking refuge from desperate circumstances. Chavez Decl. ¶ 3. They have been eager to leave the Brooklyn shelter in which they were housed due to overcrowding, a lack of privacy, and constant noise which have prevented them from sleeping. *Id*. ¶ 6. They decided to join NYC's relocation program to find a quiet and stable place build their new lives. *Id*. ¶ 8. Over the course of several days, the plaintiffs were repeatedly told they would be leaving New York City for these new locations only to have their departures postponed time and again due to the defendants' efforts to prevent them from coming. *Id*. ¶¶11-16. And now that three of the plaintiffs have begun their stays in Orange County, *id*. ¶¶ 18-20, the defendants continue to threaten to uproot them yet again by enforcing the challenged executive orders ban on providing shelter to migrants.

In addition, the defendants' refusal to permit the plaintiffs to access the shelter, and other services New York City has agreed to provide them in Rockland and Orange County, places the plaintiffs at imminent risk of becoming homeless. The defendants' orders bar *any* hotel, motel, short-term rentals, or multiple dwelling from agreeing to house them. Orange County's executive order in fact threatens that enforcement of local zoning codes will "result[] in large-scale

homelessness for these migrants and asylum seekers." Exhibit 1. And it is far from clear whether the plaintiffs would be able to find adequate shelter in New York City, even if they could find return transport, as the City has announced that it can no longer provide adequate shelter to every unhoused person. Exhibit 13. The threat of eviction and homelessness is a separate basis establishing a risk of irreparable harm. *Tellock v. Davis*, No. 02-CV-4311, 2002 WL 31433589, at *7 fn. 2 (E.D.N.Y. Oct. 31, 2002) ("threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test for preliminary injunctive relief" (citing *McNeil v. New York City Housing Authority*, 719 F. Supp. 233, 254 (S.D.N.Y. 1989)); *see also Calvagno v. Bisbal*, 430 F. Supp. 2d 95, 100 (E.D.N.Y. 2006) (holding that plaintiffs will suffer irreparable harm by losing their only residence); *In re Slater*, 200 B.R. 491, 495 (E.D.N.Y. 1996).

## II.     THE PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

The plaintiffs seek preliminary relief on both of their claims under the United States Constitution as well as their claim under Title II of the Civil Rights Act of 1964. To obtain that relief, they need show a likelihood of succeeding on just one of those claims. *See, e.g.*, *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018). Here, the plaintiffs can make that showing as to each.

### A.     The Challenged Executive Orders Violate the Plaintiffs' Due Process Rights to Intrastate Travel.

The defendants' actions seeking to bar migrants and asylum-seekers from traveling to and residing in their counties violate the right to intrastate travel that is part of the Due Process Clause of the Fourteenth Amendment. The "fundamental right to travel within a state" is well established in the Second Circuit. *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008); *see also Spencer v. Casavilla,* 903 F.2d 171, 174–75 (2d Cir.1990) (reinstating complaint

alleging a violation of the "constitutional right to travel" arising from the murder of a young black man riding his bicycle in Coney Island); *Jeffery v. City of New York,* No. 20-CV-2843, 2022 WL 204233, at *5 (E.D.N.Y. Jan. 24, 2022) ("Freedom of movement, which includes the freedom to travel within a state, is a well-established fundamental right"); *Streetwatch v. Nat'l R.R. Passenger Corp.*, 875 F. Supp. 1055, 1064 (S.D.N.Y. 1995) (finding plaintiffs likely to prevail on claim that the arrest and ejection of homeless people from Penn Station violated the fundamental right to free movement within New York State). This right protects "movement between places," for example, "the relocation of a permanent residence from one city to another." *See Williams*, 535 F.3d at 75 (collecting cases).

The Supreme Court has repeatedly stated that a law enacted for the purpose of inhibiting migration by needy persons into a state is "constitutionally impermissible."[1] *See Saenz v. Roe,* 526 U.S. 489, 499 (1999); *see also Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 620 n. 9 (1985) ("A state objective to inhibit migration into the State would encounter 'insurmountable constitutional difficulties.'" (quoting *Zobel v. Williams,* 457 U.S. 55, 62 n. 9 (1982)); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 263–64 (1974); *Shapiro v. Thompson,* 394 U.S. 618, 643 (1969) (referring to the right to interstate travel as "a virtually unconditional personal right, guaranteed by the Constitution to us all"); *Edwards v. California*, 314 U.S. 160 (1941) (invalidating a state law that impeded the free interstate passage of indigent people). As Justice Douglas explained, "freedom of movement is the very essence of our free society, setting us apart. Like the right of assembly and the right of association, it often makes all other rights meaningful—knowing, studying, arguing, exploring, conversing, observing and even thinking."

---

[1] While these cases concern the right to *inter*state travel, that right is the "correlative constitutional right to travel within a state," recognized in the Second Circuit, *see Williams*, 535 F.3d at 75, and the Supreme Court's reasoning applies with equal force to those claims.

*Aptheker v. Secretary of State,* 378 U.S. 500, 520 (1964) (Douglas, J., concurring). A law

"implicates the right to travel when it actually deters such travel, when impeding travel is its

primary objective, or when it uses any classification which serves to penalize the exercise of that

right." *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 53 (2d Cir. 2007) (quoting *Att'y

Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 903 (1986)).

On their face, the challenged orders implicate the plaintiffs' fundamental right to move

freely within the New York by banning the transport and housing of migrants within the two

counties. The Rockland County executive order seeks to bar contracts to "transport migrants or

asylum seekers to locations in the County, or to house persons at locations in the County for any

length of time without the express written permission of the County Executive." Exhibit 3. The

Orange County order instructs "all hotels, motels, and/or facilities allowing for short-term

rentals" not to accept "migrants and/or asylum seekers for housing within Orange County."

Exhibit 1. The defendants have also made clear that impeding travel to their counties is the

primary objective of these orders. As Defendant Neuhaus explained, his order "tells the hotels

here do not accept any of these asylum seekers and that's the way it's going to be," Exhibit 18,

explaining further "I am opposed to these asylum seekers being sent to our communities,"

Exhibit 6. In speaking about the planned relocation of migrants to Rockland County, Defendant

Day threatened "[w]hatever we need to do to stop this, we will do." Exhibit 4.

These measures are also likely to be effective. Migrants are unlikely to travel to the

counties if they are unable secure housing. And many migrants will be unable to travel to the

counties from New York City or find adequate housing in those counties absent the assistance

from New York City the Rockland order purports to ban. Others may be dissuaded from

relocating to cities where they will be unable to secure housing and face discrimination and

outright hostility, stoked by the defendants' statements and executive orders, from the communities they wish to call home. *See* Nick Caloway and Tony Aiello, *Orange County joins Rockland in declaring state of emergency over Mayor Adams' plan to bus asylum seekers to suburbs*, CBS News, May 8, 2023 (attached as Exhibit 10 to Belsher Decl.).

As the Second Circuit has noted repeatedly, laws and policies that burden the fundamental right to free movement within the state are subject to strict scrutiny. *Williams*, 535 F.3d at 75; *King v. New Rochelle Municipal Housing Authority,* 442 F.2d 646, 648 (2d Cir. 1971) (applying strict scrutiny to a five-year residency requirement for municipal public housing because that requirement affected a "fundamental right" of two applicants who had moved to the city from elsewhere within the state); *Ramos v. Town of Vernon,* 353 F.3d 171, 176 (2d Cir. 2003) (because the curfew in question "limit[ed] the constitutional right to free movement within the [t]own ..., we assume that were this ordinance applied to adults, it would be subject to strict scrutiny."). Accordingly, the defendants must show their orders are narrowly tailored to achieve a compelling governmental interest. *See Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351, 368 (S.D.N.Y. 2007), *aff'd,* 308 F. App'x 511 (2d Cir. 2009).

The challenged executive orders are far from narrowly tailored to achieve a compelling government interest. Starting with the threshold question of whether the counties can demonstrate a compelling interest, the executive orders and emergency declarations focus on an interest in conserving resources for other residents. *See, e.g.,* Rockland Emergency Declaration, Exhibit 2 (explaining the migrants "will spike the number of people in need of government services at all levels of government in the County from Villages to Towns and School Districts, and other services that require expenditure of local tax dollars. . ..."); Orange County EO, Exhibit 1 (explaining the migrants "will spike the number of people in need of government  services at

all levels of government in the County" and the county "cannot accommodate additional homeless individuals"); Exhibit 15 (stating that the program "is only draining taxpayer resources from the families who are already here").

This goal—"that each community should take care of its own first"—is one that the Supreme Court and the Second Circuit already have found unconstitutional. *King,* 442 F.2d at 649 (citing *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969)). In *Shapiro*, the Supreme Court held that "the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible." 394 U.S. at 629. The Court confirmed this finding in its later decision, *Saenz v. Roe,* finding a residency requirement for certain welfare benefits "may not be justified by a purpose to deter welfare applicants from migrating to California" because "such a purpose would be unequivocally impermissible." 526 U.S. at 506 (citing *Shapiro*, 394 U.S. at 631). While the county may "ha[ve] a valid interest in preserving the fiscal integrity of its programs," it "may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Shapiro*, 394 U.S. at 633. Because the defendants' executive orders have "no other purpose than to chill the assertion of constitutional right[]" to travel to Rockland and Orange Counties, "by penalizing those who choose to exercise them," they are "patently unconstitutional.'" *Shapiro,* 394 U.S. at 631 (citation omitted).

Because the defendants' proffered justification is constitutionally impermissible, there is no "compelling governmental interest" at stake and no need to examine here whether the challenged orders are narrowly tailored to that interest. *See King*, 442 F.2d at 649. In any event, as described below, *supra* Section B, the defendants' orders do not survive strict scrutiny. Rockland and Orange Counties "do not have any right to select their citizens. The Fourteenth Amendment, like the Constitution itself, was, as Justice Cardozo put it, 'framed upon the theory

that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division.'" *Saenz*, 526 U.S. at 511 (quoting *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 523 (1935)).

**B.      The Challenged Executive Orders Violate the Plaintiffs' Rights to Equal Protection.**

In addition to violating their right to travel, the challenged executive orders discriminate against the plaintiffs on the basis of their national origin, alienage, and race, violating their rights to equal protection under the law in the Fourteenth Amendment. Under the Equal Protection Clause, classifications based on race, national origin, or alienage are subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest. See *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) ("[W]hen a statute classifies by race, alienage, or national origin" it is "subjected to strict scrutiny . . . ."); see also *Graham v. Richardson*, 403 U.S. 365, 371–72 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.").

To trigger strict scrutiny, "the plaintiff must allege that a government actor intentionally discriminated against him or her on the basis of race or national origin." *Jana-Rock Const., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976); *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir.1999)). The Supreme Court and Second Circuit both have held that alienage is a similarly protected classification. *See, e.g., City of Cleburne*, 473 U.S. at 440 (noting that classifications "by race, alienage, or national origin" trigger strict scrutiny); *Dandamudi v. Tisch*, 686 F.3d 66, 77 (2d Cir. 2012) ("[T]he Fourteenth Amendment is written broadly as protecting all persons and that aliens necessarily constitute a discrete and insular minority because of their impotence in the political

process, and the long history of invidious discrimination against them.") (internal quotations omitted).

To demonstrate this intentional discrimination, plaintiffs can "point to a law or policy that expressly classifies persons on the basis of race," "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner," or "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000) (internal citations omitted). "When the government expressly classifies persons on the basis of race or national origin . . . its action is 'immediately suspect.'" *Jana-Rock*, 438 F.3d at 204–05 (quoting *Johnson v. California*, 543 U.S. 499, 509 (2005)); *see also Shaw v. Reno*, 509 U.S. 630, 642–43 (1993). Where such express classification is present, the plaintiff "need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Jana-Rock*, 438 F.3d at 205; *see also Shaw*, 509 U.S. at 642 ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute."). Instead, "[t]he burden of proof shifts, strict scrutiny applies, and under strict scrutiny, the government defending the constitutionality of the law has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Jana-Rock*, 438 F.3d at 205 (internal citations and quotations omitted).

Here, both Rockland County and Orange County's executive orders expressly classify persons based on national origin and alienage and are therefore subject to strict scrutiny. The Rockland County order expressly bars contracts "to transport *migrants or asylum seekers* to locations in the County, or to house persons at locations in the County for any length of time without the express written permission of the County Executive." Exhibit 3. The order further

prohibits any "hotel, motel, or owner of a multiple dwelling in Rockland County" from "contract[ing] or otherwise engage in business with any other municipality other than the County of Rockland for the purpose of providing housing or accommodations for *migrants or asylum seekers* without a license granted by the County." *Id.* (emphasis added). The Executive Order issued by Orange County similarly orders that, "all hotels, motels and/or any facilities allowing short-term rentals do not accept said *migrants and/or asylum seekers* for housing within Orange County." Exhibit 1 (emphasis added). These orders thus expressly classify individuals based on their status as migrants and asylum seekers, and therefore, on the basis of their national origin and alienage. *See Parada v. Anoka County*, No. 21-CV-3082, *3–4 (8th Cir. Nov. 30 2022) (deeming a county policy that treated persons born outside of the United States differently than those born within the United States to be "a classic example of national-origin discrimination" because "[o]n its face, [the policy] treats people differently depending on where they were born"); *Anderson v. Conboy,* 156 F.3d 167, 171 (2d Cir. 1998) (noting that "alienage discrimination" entails discrimination based on citizenship); *see also Vaughn v. City of New York*, No. 06-CV-6547, 2010 WL 2076926, at *10 (E.D.N.Y. May 24, 2010) (defining "discrimination on the basis of alienage" as discrimination based on "non-U.S. citizenship"). Accordingly, the executive orders are "immediately suspect" and trigger strict scrutiny. *Jana-Rock*, 438 F.3d at 204–05.

In addition to showing intentional discrimination based upon an express classification, plaintiffs can also show intentional discrimination exists where "a discriminatory purpose [was] a motivating factor" in the government's action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *see also Brown*, 221 F.3d at 337. Discriminatory purpose can be demonstrated by "sensitive inquiry into such circumstantial and direct evidence of intent

as may be available." *Id.* at 266; *see also Centro Presente v. U.S. Dep't of Homeland Sec*., 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("[T]he combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy [is] sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision."). For example, in *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019), the court granted the plaintiffs' motion for a preliminary injunction, holding that "disparaging comments regarding Haitians and other non-white immigrants" and the Department of Homeland Security's departure from ordinary procedure was "both direct and circumstantial evidence a discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate TPS for Haiti." *Id.* at 371, 374.

The challenged executive orders also discriminate against migrants and asylum seekers based on race because of the discriminatory purpose underlying their enactment as evidenced by the racialized comments made by the defendants. Racist statements can demonstrate discriminatory intent, even when veiled behind racially charged code words. *See, e.g., Vill. of Arlington Heights*, 429 U.S at 268 (noting that "contemporary statements" of relevant decision makers can demonstrate racially discriminatory intent); *see also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608-609 (2d Cir. 2016) (stating that "[r]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications" even without the use of "explicitly racial language"). Referring to migrants and asylum seekers, Defendant Day stated that "within that cadre of people . . . we have child rapists, we have criminals," and, referring a Latin-American gang, "we have MS-13." Exhibit 7. Defendant Day also stated that he would not permit the program to "destroy"

the county, that he hopes to "end[] this threat to our community," that he was working to "protect . . . the character of [the] community," that his efforts would "ensure [the county's] way of life is not compromised" by the program, and that "diverting busloads of undocumented individuals to [Rockland] County . . . only incentiviz[e]s illegal immigration which does nothing to support . . . hardworking citizens." Exhibit 19. Defendant Neuhaus has lamented that "these people" could "be walking around your kid's elementary school" and stated, "I am opposed to these asylum seekers being sent to our communities." Exhibit 6; Exhibit 16.

The challenged executive orders fail to satisfy strict scrutiny because they are not narrowly tailored to serve a compelling state interest. As noted above, the counties have justified their executive orders as necessary to preserve county resources. As an initial matter, the counties' interest in preserving resources is both speculative and inconsistent with available information. The counties have grossly overstated the number of immigrants expected to enter as "potentially thousands," and based on these inflated estimates, speculatively claim significant future drains on their resources. Exhibit 1; Exhibit 4 (noting New York City's plan includes the relocation of about 300 people to the two counties). However, Rockland and Orange Counties have not demonstrated their resources are at any real or immediate risk of depletion given the relatively low number of migrants registered to relocate to these areas and New York City's commitment to provide wraparound services including shelter, food, and healthcare for the first four months after their arrival.[2] Nor have they identified with any meaningful specificity what those resource requirements might be or any other steps they have taken to ensure they can meet

---

[2] The executive orders also invoke public safety but do not explain or substantiate that concern. Far from a legitimate concern, the defendants' comments speculating about the potential criminal histories of those relocating betrays only the animus behind these orders.

the needs of current and future residents.[3] These justifications are also difficult to reconcile with the defendants' claims that undocumented people are not eligible for county resources. Rockland Press Release Exhibit 8 ("Social Services funding is also not applicable to undocumented individuals, so we have no financial support to help those without a legal status."); Orange County EO, Exhibit 1 ("There is no legal basis to provide adequate services to these migrants or asylum seekers by the County's Department of Social Services because of their age and immigration status."). Any perceived risk to county resources is even more speculative now given Governor Hochul has declared a state of emergency in New York for the express purpose of marshalling resources to help local governments absorb any influx of new residents. *See* Exhibit 9.

In addition to lacking a compelling justification, the counties cannot demonstrate that their sweeping executive orders are narrowly tailored. The executive orders are not limited to people in need of government services. The orders broadly bar transport and housing for *any* migrant or asylum-seeker. In doing so, they necessarily, and falsely, assume that all such people who relocate to these counties would burden, rather than benefit, those locales. It also assumes that all migrants and asylum seekers who come to the counties will remain there after New York City's program providing services to them ends. The defendants' categorical exclusion of all migrants cannot satisfy strict scrutiny.

---

[3] Here, it is worth noting the defendants could use the emergency powers provided under Executive Law Section 24 to suspend, as needed, any local zoning ordinances and establish or designate emergency shelters. *See* N.Y. Exec. Law § 24(f), (g). Instead, the executive orders enact *additional* barriers to shelter.

### C. The Executive Orders Violate the Supremacy Clause of the United States Constitution.

The executive orders also violate the Supremacy Clause of the federal Constitution,[4] as they are preempted by federal immigration law. The Supreme Court has explained that "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). As a result, federal law broadly preempts state and local laws seeking to regulate noncitizens. *Id*. at 398-99.

State and local laws purporting to regulate the ability of noncitizens to secure housing or to travel fall squarely within this preemptive effect of federal law. Though the Second Circuit has not faced such a dispute, the Fifth, Third, and Eleventh Circuits have invalidated state and local laws that, like the executive orders before this Court, targeted noncitizens for restrictions on travel and housing. *See Villas at Parkside Partners v. City of Farmers Branch, Texas,* 726 F.3d 524, 529–37 (5th Cir. 2013) (en banc) (holding that local restrictions on housing noncitizens were preempted under the Supremacy Clause), *cert. denied*, 571 U.S. 1237 (2014); *Lozano v. City Hazelton*, 724 F.3d 297, 313–22 (3d Cir. 2013) (same), *cert. denied*, 571 U.S. 1237 (2014); *United States v. Alabama*, 691 F.3d 1269, 1285–88 (11th Cir. 2012) (holding that state laws criminalizing actions to encourage a noncitizen "to come to or reside in" Alabama and criminalizing the renting of housing to noncitizens were preempted under the Supremacy Clause), *cert. denied*, 569 U.S. 968 (2013). Under this caselaw, the executive orders at issue in this case plainly violate the Supremacy Clause and therefore are invalid.

---

[4] U.S. Const., Art. VI, Clause 2 (providing in relevant part that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding").

**D.      The Executive Orders Violate the Civil Rights Act of 1866.**

The executive orders also violate Section 1 of the Civil Rights Act of 1866 – codified as

42 U.S.C. § 1981 – which in relevant part provides that "[a]ll persons within the jurisdiction of

the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by

*white citizens*" (emphasis supplied). The Supreme Court long ago held that Section 1981

prohibits not only discrimination against nonwhite citizens but also discrimination against

noncitizens. *See Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419-20 (1948) (noting

protection of Section 1981 "has been held to extend to aliens as well as citizens").

Here, the executive orders expressly target "migrants" and "asylum seekers," which

plainly constitutes discrimination against people who are not "white citizens," and seek to negate

contracts entered into by New York City to provide housing for the plaintiffs. That the plaintiffs

are only third-party beneficiaries of the contracts does not undermine their claim, as the Second

Circuit (and other courts) has recognized that third-party beneficiaries can claim the protections

of Section 1981. *See Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1339-40 (2d Cir.

1974) (in reversing dismissal of Section 1981 case challenging denial of pool access to Black

children who were the guests of party to the contract, noting a Black guest "would be a third-

party beneficiary, able to enforce the contract"); *see also Macedonia Church v. Lancaster Hotel

Limited Partnership*, 560 F. Supp. 2d 175, 179-80 (D. Conn. 2008) (in dispute in which a church

entered into a contract for hotel rooms and church members alleged they were denied access

because they were Black, holding church members could pursue Section 1981 claim as third-

party beneficiaries to contract). As third-party beneficiaries of the contracts entered into by New

York City to house them, the plaintiffs before this Court have a straightforward claim that the

executive orders violate Section 1981.

**E.    The Challenged Executive Orders Violate the Plaintiffs' Rights to Public Accommodations Under Title II of the Civil Rights Act of 1964.**

The defendants' executive orders also deny the plaintiffs equal use and enjoyment of hotels in Rockland and Orange Counties in violation of Title II of the Civil Rights Act of 1964. Title II prohibits discrimination based on national origin or race, among other categories, in places of public accommodation. 42 U.S.C. § 2000a(a). "[T]he overriding purpose of Title II [was] to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307–08 (1969); *see also Guichardo v. Langston Hughes Queens Libr.*, No. 15-CV-2866, 2015 WL 13227995, at *3 (E.D.N.Y. Nov. 20, 2015). Under the Act, the plaintiffs are "entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation," including hotels, motels, and inns. *See* 42 U.S.C. § 2000a(a). And the Supreme Court has explained, in vacating state convictions for activity protected by Title II, that government actors cannot apply "laws in a way that would deprive any person of the rights granted under the Act." *See Hamm v. City of Rock Hill*, 379 U.S. 306, 311 (1964).

Here, the plaintiffs are being denied access to the hotel, motel, and short-term lodging accommodations in Rockland and Orange Counties as a consequence of the challenged executive orders. Hotels and motels subject to the executive orders plainly are places of public accommodation. 42 U.S.C. § 2000a(b)(1) (defining public accommodation to include hotels, motels, and other establishments that provide lodging to transient guests). And the orders' targeting of "migrants" and "asylum seekers" plainly bring them within the Title II's protected categories, a conclusion that becomes all the more evident when considered in conjunction with the public statements made by the defendants, *see* Exhibit 6 ("I am opposed to these asylum

seekers being sent to our communities."); *see also* Exhibit 16 ("Who are these people? What's their background?").

## III.  THE EQUITIES WEIGH HEAVILY IN THE PLAINTIFFS' FAVOR AND A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST.

The balance of equities and the public interest tip decidedly in the plaintiffs' favor. As this Court has recognized, "[t]he Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Averhart,* 2021 WL 2383556, at *16 (citing *Sajous v. Decker*, No. 18-CV-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018) and then citing *Mitchell v. Cuomo*, 748 F.2d 804, 808 (2d Cir. 1984)).

The plaintiffs seek an order that merely permits them to access spaces to which they are constitutionally and statutorily entitled. Specifically, the plaintiffs seek nothing more than to freely travel to, and reside within, Rockland and Orange Counties. The defendants' policy subjects the plaintiffs to invidious, highly publicized discrimination in the places they are attempting to resettle. And enforcement of the executive orders would mean the summary eviction of the plaintiffs from their only source of shelter, placing them at risk of homelessness.

In contrast, the defendants are unlikely to suffer any harm from a decision requiring them to comply with the constitution and federal law. At most, they may experience the type of financial and administrative burdens this Court has found insufficient to outweigh a constitutional violation. *See Averhart,* 2021 WL 2383556, at *16. And even those claimed harms are attenuated to the extent they exist at all. *See supra*, Section II.B. There appears to be no legitimate justification for the defendants' adoption of this cruel and unlawful policy and, in any event, no legitimate government interest which outweighs the plaintiffs' interest in the ability to

move freely and with dignity in public spaces. Ultimately, the "government suffers no harm from an injunction that merely ends unconstitutional practices and/or ensures that constitutional standards are implemented." *Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017) (citations omitted). To the contrary, the public interest lies with enforcing the constitution. *See Am. Beverage Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (cleaned up)); *P.G. v. Jefferson Cnty., New York*, No. 5:21-CV-388, 2021 WL 4059409, at *5 (N.D.N.Y. Sept. 7, 2021) ("[T]he public interest lies with enforcing the Constitution." (cleaned up)). Accordingly, the public interest and balance of equities weigh heavily in the plaintiffs' favor.

## CONCLUSION

For all these reasons, the Court should grant the plaintiffs' request for preliminary injunctive relief and enjoining, during the pendency of this action, (1) Defendant Edwin J. Day from all actions taken pursuant to the Rockland County Emergency Order No. 1, dated May 6, 2023; and further enjoining (2) Defendant Steven M. Neuhaus from all actions taken pursuant to the Orange County Executive Order of May 8, 2023.

Dated: May 15, 2023
New York, New York

New York Civil Liberties Union
Foundation

*/s/ Amy Belsher*

AMY BELSHER
ANTONY GEMMELL
GUADALUPE V. AGUIRRE
IFY CHIKEZIE
CHRISTOPHER DUNN
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: 212-607-3300
abelsher@nyclu.org
agemmell@nyclu.org
laguirre@nyclu.org
cdunn@nyclu.org
ichikezie@nyclu.org

*Counsel for Plaintiffs*

\* Application for admission in the Southern District of New York forthcoming