UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/6/2023
```

SIDI MOUHAMED DEIDE, ADAMA SY,
ABDALLAHI SALEM, MOUHAMED SAID
MALOUM DIN, and JHONNY NEIRA on behalf of
himself and all similarly situated people,

                    Plaintiffs,

                    v.

EDWIN J. DAY as Rockland County Executive;
STEVEN M. NEUHAUS as Orange County Executive,

                    Defendants.

No. 23-cv-3954 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

      On May 11, 2023, Plaintiffs Sidi Mouhamed Deide, Adama Sy, Abdallahi Salem, and

Mouhamed Said Maloum Din (hereinafter, "Plaintiffs"), on behalf of themselves and a putative

class, filed the instant action against Defendants Edwin J. Day, the Rockland County Executive

(hereinafter, the "Rockland County Defendant") and Steven M. Neuhaus, the Orange County

Executive (hereinafter, the "Orange County Defendant") challenging Rockland County and

Orange County emergency executive orders (hereinafter, the "EOs") that prevent migrants and

asylum seekers from relocating into their counties by, *inter alia*, barring local hotels/ and motels

from making their rooms available these individuals. (ECF No. 1.)  The EOs were issued in

response to New York City's program, announced on May 5, 2023, whereby New York City is

transporting migrants and asylum seekers who opted into the program to temporarily live in two

hotels it contracted with (the Crossroads Hotel, located in Newburgh, Orange County and the

Armoni Inn and Suites, located in Orangeburg, Rockland County).  Under the program, New York

City expects to provide lodging, meals, and social services to these individuals for a period of four months.

An amended complaint (ECF No. 11, the "AC") was filed on May 15, 2023 adding in an additional Plaintiff, Jhonny Neira, and raising the following claims against the Rockland County and Orange County Defendants: (i) violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (insofar as it relates to interstate commerce); (ii) violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (iii) violation of the Supremacy Clause of the U.S. Constitution; (iv) violation of Title II of the Civil Rights Act of 1964, 42 U.S.C § 2000a et seq; (v) violation of N.Y. Executive Law § 24; (vi) violation of N.Y. Executive Law § 296(2)(a); and (vii) violation of 42 U.S.C. § 1981.

That same day, Plaintiff filed a motion for preliminary injunction and a proposed Order to Show Cause with Emergency Relief (ECF Nos. 12 and 16).  The Court signed the Order to Show Cause on May 16, 2023 (ECF No. 20) and held oral argument on the preliminary injunction application on June 1, 2023.  During the oral argument, the Court directed the parties to submit supplemental briefing on their abstention arguments in light of recent temporary restraining orders issued by state courts in cases relating to New York City's program.

Upon the Court's careful consideration of the parties' moving and opposition papers and their arguments made at the June 1, 2023 hearing, the Court GRANTS Plaintiffs' application for preliminary injunction.  The Court makes clear that the Court's instant decision does not opine on or interfere with temporary restraining orders that were issued in state courts, described below. *See infra*.  In those cases, the state courts are contending exclusively with state law questions regarding whether New York City's program is unlawful under New York law, or whether certain

municipalities can enforce their local zoning and municipal codes against the hotels/motels housing the migrants and asylum seekers in purported violation of those laws. *See infra*.

## **FACTUAL BACKGROUND**

The following facts are taken from the parties' submissions, including Plaintiffs' AC. *See* ECF No. 13, Plaintiffs' opening memorandum ("Pls.' Mem."); ECF No. 14, declaration of Amy Belsher in support of preliminary injunction motion ("Belsher's Decl."); ECF No. 15, declaration of Lourdes Chavez in support of preliminary injunction motion ("Chavez Decl."); ECF No. 18, affidavit of Amy Belsher in support of order to show cause; ECF No. 29, Orange County Defendants opposition memorandum ("Orange County Opp."); ECF No. 27, declaration of Matthew J. Nothnagle in opposition to preliminary injunction motion on behalf of Orange County Defendant ("Nothnagle Decl."); ECF No. 28, affidavit of Darcie M. Miller in opposition to preliminary injunction motion on behalf of Orange County Defendant ("Miller Aff."); ECF No. 35 Rockland County Defendant opposition memorandum ("Rockland County Opp."); ECF No. 31, declaration of Larraine Feiden in opposition to preliminary injunction motion on behalf of Rockland County Defendant ("Feiden Decl"); ECF No. 37, reply memorandum in support of preliminary injunction motion ("Reply"); ECF No. 38, reply declaration of Amy Belsher ("Belsher Reply Decl."); ECF No. 39, Jhonny Neira declaration in support of preliminary injunction motion ("Neira Decl."); ECF No. 53, Plaintiffs' supplemental memorandum ("Pls.' Supp. Mem."); ECF No. 53, Defendants' supplemental memorandum in support of abstention ("Defs.' Supp. Mem."); and ECF No. 54, Matthew G. Parisi's declaration with accompanying supplemental exhibits in support of abstention ("Parisi Decl."). Additionally, "in deciding a motion for a preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."

*See Helio Logistics, Inc. v. Mehta*, No. 22-CV-10047, 2023 WL 1517687, at *2 (S.D.N.Y. Feb. 3, 2023) (cleaned up).

## I.    MIGRANT CRISIS IN NEW YORK CITY

Over the past year, over 60,800 migrants have arrived in New York City.  (AC ¶ 13.)  As a result of the large influx of migrants, New York City began to establish and operate temporary "Human Emergency Relief and Response Centers," and has provided temporary housing, food, medical care, and case work and other social services for over 36,738 of these migrants.  (*Id*.)  As of May 11, 2023, the policy changes with respect to the U.S.-Mexico border is expected to change, and New York City officials expect as many as 1,000 people a day to begin arriving in New York.  *Id*. ¶ 14.)  New York City has stated that its shelter system is operating beyond its capacity.  (*Id*. ¶ 15.)

On May 9, 2023, New York Governor Hochul declared a state of emergency due to "the arrival of increased numbers of migrants seeking shelter" in New York City and State.  (*Id*. ¶ 33.)  Governor Hochul's directive authorizes agencies and the Red Cross "to assist affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety."  (*Id*.; Belsher Decl., Exh. 9, N.Y. Exec. Order 28.)  The order also suspends certain state laws governing contracts, purchasing rules, and real property which will allow the state to buy goods and lease buildings, and enable additional spaces to be used to shelter migrants throughout the state.  (*Id*. ¶ 33; Belsher Decl., Exh. 9, N.Y. Exec. Order 28.)

On May 5, 2023, New York City Mayor Eric Adams issued the New York City Emergency Executive Order 398, which declares a state of emergency in New York in connection with the migrant crisis.  *See* N.Y. Exec. Order 398.  That same day, Mayor Adams announced a

"new, voluntary program," open to the plaintiffs and other migrants located in makeshift shelters around New York City.  (*Id.* ¶ 16.)  Under the program, described by Mayor Adams as a way for participants to establish "connections to local communities as they build a stable life in New York State," New York City would offer transportation to Orange and Rockland Counties, where program participants would continue to receive temporary lodging, meals, and social services funded by New York City.  (*Id.*)  To effectuate this program, New York City entered into contracts with two hotels: the Crossroads Hotel, located in Newburgh in Orange County, and the Armoni Inn and Suites, located in Orangeburg in Rockland County.  (*Id.* ¶ 17.)  New York City expects to provide lodging, meals, and social services for a period of four months.  (Belsher Decl., Exh. 12.)

## II.     PLAINTIFFS OPTED INTO THE NEW YORK CITY PROGRAM

Plaintiffs are a class of migrants and asylum seekers who are participating in or will be participating in New York City's program that provides transportation to Rockland and Orange Counties and temporary lodging, meals, and social services for migrants and asylum seekers in the program.  (AC ¶ 3.) Each named plaintiff has or had been living in a makeshift shelter for migrants in Brooklyn, NY, and volunteered to participate in the City's program as they wished to relocate to Rockland or Orange Counties.  (*Id.* ¶¶ 4, 18, 19.)  They were scheduled to travel to a hotel in one of the counties on May 10 but were unable to do so initially because of actions taken by Rockland and Orange County (*Id.* ¶ 4.)  On May 11, four of the plaintiffs (Side Mouhamed Deide, Abdallahi Salem, Mouhamed Said Maloum Din, and Jhonny Neira) traveled by bus to the Crossroads Hotel in Newburgh and were permitted to enter.  (*Id.*; *see also* Chavez Decl. ¶¶ 17–20, 22–23; Neira Decl. ¶ 3.)  At the time of the filing of the amended complaint, at least one plaintiff (Adama Sy) remains in New York City, after earlier attempts to travel to Rockland County or Orange Counties failed.  (AC ¶ 4.)

5

**III.    ROCKLAND AND ORANGE COUNTY EMERGENCY EXECUTIVE ORDERS**

    **A. Rockland County Emergency Declaration and Contemporaneous Press Releases and Media Coverage**

On Saturday, May 6, 2023, the Rockland County Defendant declared a state of emergency "arising from New York City's program to rapidly increase the number of migrants . . . to unsustainable levels" and issued Emergency Order No. 1 (the "Rockland EO"), which was renewed on March 10, 2023 and again on March 16, 2023.  (Belsher Decl., Exhs. 2 & 3; Feiden Decl. Exhs. D & H.)  A contemporaneous press release issued on May 5, 2023 stated: "This State of Emergency prohibits other municipalities from bringing and housing people in the County and prohibits hotels and motels from housing immigrants without a license and requires any municipalities that might bring migrating or asylum-seeking people into Rockland County to ensure they will be fully cared for and paid for." (Belsher Decl., Exh. 8.)  At some point after Rockland County initially issued its EO, New York City representatives contacted Rockland County and advised that they would continue with implementation of their plan to temporary shelter asylum seeking individuals to the Aromni Inn & Suites in Orangeburg, Rockland County. (Rockland County Opp. at 4.)

When issued, the EO stated that Rockland County "is not capable of receiving and sustaining the volume of migrants and asylum seekers that New York City intends to send over, whose presence will spike the number of people in need of government services at all levels of government in the County from Villages to Towns and School Districts . . . "  (Belsher Decl. Exh. 2.)

On May 18, 2023, while the instant preliminary injunction application was being briefed, Rockland County amended its EO.  (Feiden Decl., Exh. H (hereinafter, the "Rockland EO").  Key portions of the amended EO are as follows:

"I recognize that people in need of services may be comprised of any class of persons, citizen or non-citizen, of any immigration status, of any race, religion, national origin, or other group. However, because the City of New York has singled out asylum seekers and migrants to deport them from New York City to other municipalities, as described in its "[sic]"The Road Forward: A blueprint to address the City of New York's response to the asylum seeker crisis" the response to the emergency created by the City of New York, speaks in the same terms as the City of New York's program."

(Rockland EO at 1.)

"As such, I particularly address the exercise of New York City's "decompression" strategies with respect to the migrants and asylum seekers that New York City has identified and intends to deport to Rockland County. These strategies are viewed being a problem of New York City's own invitation and manufacture, and are necessitated by New York City's ill-considered declaration being a sanctuary city, and New York City's poor planning for the consequences of that declaration."

(*Id*. 1–2)

"This order barring other municipalities from unilaterally deciding to house and shelter individuals in their care by deporting them to Rockland County shall not be read to have the purpose of barring any person, including migrants or asylum seekers, from traveling to or residing in the County. Its sole purpose is to prevent other municipalities from foisting their own policies, including sanctuary city policies, costs, and responsibilities on Rockland County."

(*Id.* at 2.)

"No municipality may make contracts with persons, businesses, or entities doing business within the County to transport persons, including but not limited to migrants or asylum seekers to locations in the County, or to house or shelter such persons at locations in the County for any length of time without the municipality obtaining express, written permission of the County Executive."

(*Id*. at 2, § 1(A).)

"No hotel, motel, or owner of a dwelling or non-dwelling structure converted to a dwelling or shelter in Rockland County is permitted to contract or otherwise engage in business with any other municipality other than the County of Rockland (an "external municipality") for the purpose of providing housing or accommodations for any persons, including but not limited to migrants or asylum seekers or otherwise without a license granted by the County."

(*Id*. at 2, § 1(B).)

Under the EO, licenses will only be granted at the discretion of the Rockland County Office of the County Executive's Director of Public Policy and Intergovernmental Relations (the "Director"), and will only be granted where, to the satisfaction of the Director, both the applicant and the external municipality demonstrate that (i) persons being housed by the external municipality will be returned to that external municipality or another location outside Rockland County within 15 days; (ii) the external municipality demonstrates that it "has sufficient funding to sustain the needs of the migrants or asylum seekers during the time of their stay"; (iii) that external municipality agrees to assume any costs expended by any municipality in Rockland County; and (iv) the applicant and the external municipality each have a performance bond for the conditions set by the license in the amount of $2,000 per person being housed or sheltered at the applicant's facility.  (*Id*. at 2–3, § 1(B)(1)– (4).)

Furthermore, the Sheriff, Director, and Director's designees are authorized to issue appearance tickets for violations of the EO, and persons who violate the EO or any term or condition of any license issued pursuant to the EO shall be liable to a civil penalty, no more than $2,000 "per homeless person, including but not limited to migrant/asylum seekers or otherwise housed by the external municipality or other violator, for each day or part thereof during which such violation continues."  (*Id*. at 2–3, § 1(C)(1)– (2).)

Lastly, the EO gives the Sheriff the authority to do the following:

"In addition to such other powers or duties the Sheriff of Rockland County may consider in the exercise of the Sheriff's duties with respect to this Emergency Order, the Sheriff is authorized and directed by this order to make limited stops to notify persons suspected of transporting migrants or asylum seekers into the County in violation of the restrictions and regulations of this Emergency Order, and to similarly, notify the owners and operators of facilities suspected of housing any migrants or asylum seekers, or seeking or entering agreements with external municipalities, without the license required by this Emergency Order."

(*Id*. at 5, § E.)

There have been numerous press releases and media articles since the initial issuance of the EO, and the Rockland County Defendant and other Rockland County officials have spoken publicly regarding the Rockland EO and New York City's program.  According to a May 8, 2022 Daily Mail article, the Rockland County Defendant purportedly stated "Rockland is not going to stand idly by as your administration [referring to New York City] which boasts itself as a sanctuary city diverts busloads of undocumented individuals to our county . . . This is a duplicitous plan and everybody involved in it should be utterly ashamed of themselves." (Belsher Decl., Exh. 7 (Emma James, NY GOP Lawmaker Threatens to Grab NYC Mayor Eric Adams by the THROAT, Daily Mail, May 8, 2023).)  The Rockland County Defendant's Facebook posts on his official page stated "Mr. [Adams] . . . you will not destroy this county under my watch. You will not beat the people of Rockland County as you will find out as more development are coming that will make that clear." (Belsher Decl., Exh. 19.)   Rockland County Defendant also stated on Facebook "My Administration will continue to protect the rights of our residents and the character of your community."  (*Id*.)   He also stated on Facebook, "We have and will continue to take a strong stance on the matter of New York City trying to engage in human trafficking by busing in 300 plus adult male migrants from their sanctuary city to the Armoni Inn & Suites in Orangetown. That 'line in the sand' may have some effect as it appears this hotel, sold out as recently as yesterday morning, now is reported to be wide open for vacancies. This excellent story by Emily Young… tells of an interesting development in our battle to protect our community."  (*Id*.)  Lastly, the Rockland County Defendant states on Facebook in response to a temporary restraining order issued by the state court in Rockland County "[w]e are hopeful this puts us on the path of ending this threat to our community once and for all."  (*Id*.)

### B.  Orange County Emergency Declaration and Executive Order

On Monday, May 8, 2023, the Orange County Defendant issued an EO (the "Orange County EO") declaring a state of emergency in Orange County "in response to New York City's proposed plan to send asylum seekers to be temporarily housed at motels in the Town of Newburgh." (Nothnagle Decl., Exh. M.) As justification for the claimed emergency, the May 8, 2023 Orange County EO provides that "there is reasonable apprehension of immediate danger of public emergency of potentially thousands of persons being transported to Orange County" and that Orange County "is not capable of receiving and sustaining such volume of migrants and asylum seekers." (*Id*.) While stating that Orange County's restrictions on housing "will result in large-scale homelessness for these migrants and asylum seekers," the May 8, 2023 EO prohibits "all hotels, motels and/or any facilities allowing short-term rentals" from "accept[ing] said migrants and/or asylum seekers for housing within Orange County." (*Id*.)

In public addresses the following day, the Orange County Defendant spoke on the executive order. In one such address, he reportedly stated, "I am opposed to these asylum seekers being sent to our communities." (Belsher Decl., Exh. 6.) In a May 9, 2023 Facebook video addressed to the public, the Orange County Defendant makes comments including, "Who are these people?" and "What's their background?" and "are they going to be walking around your kid's elementary school." (Belsher Decl., Exh. 16 (Steve Neuhaus, Facebook Watch (May 9, 2023) https://m.facebook.com/StevenMNeuhaus/videos/191864616638292/?refsrc=deprecated&ref=sharing&_rdr).

On May 16, 2023, the Orange County Defendant issued an amended EO. (Nothnagle Decl., Exh. N, Orange County Executive Order 2 of 2023 Declaring A State of Emergency in Orange County In Relation To Transportation of Migrant and Asylum Seekers to Orange County, dated May 16, 2023 (hereinafter "Orange County EO")). The May 16, 2023 Orange County EO states

in pertinent part "[t]hat all hotels, motels and/or other facilities allowing short term rentals do not

contract and/or accept said migrants and/or asylum seekers for long-term housing within Orange

County."  The amended EO now requires that hotels and motels do not enter into contracts relating

to New York City's program, and states that the EO applies to long-term housing.  (*Id.*)  The Orange

County EO also states the following:

> "There is no reason to believe that these migrants or asylum seekers will leave
> Orange County after New York City ceases to pay for the housing and any services
> they are presently receiving in New York City, or that that many thousands more
> migrants or asylum seekers will not be transported to Orange County"

(*Id.*)

> "there is a reasonable apprehension of immediate danger of public emergency of
> potentially thousands of persons being transported to Orange County and that
> Orange County will be responsible for the public safety of these persons and all
> others effected in Orange County"

(*Id.*)

> "there is no legal basis to provide adequate services to these migrants or asylum
> seekers by the County's Department of Social Services because of their age and
> immigration status"

(*Id.*)

> "local zoning codes do not allow use of temporary residence hotels or other
> temporary residence facilities for use as long term residential housing and therefore
> New York City's transportation of migrants and asylum seekers to Orange County
> for that purpose is illegal"

(*Id.*)

> "through enforcement of local zoning codes, said migrants and/or asylum seekers
> will face refusal, or eviction from the illegal hotels and short term residential
> facilities, resulting in large scale homelessness for these migrants and asylum
> seekers, potentially at the cost and expense of Orange County"

(*Id.*)

> "the locations for which The City of New York intends to transport said migrants
> and/or asylum seekers to Orange County have inadequate infrastructure to meet the
> needs of said individuals, including but not limited to transportation to work, food,
> medical care, and pharmaceutical opportunities"

(*Id*.)

## IV.    RELEVANT STATE COURT PROCEEDINGS

The Orange County Defendant points to pending cases, two of which have recently been removed in federal court.  The Orange County Defendant elevates these cases as potentially being grounds for abstention.  (Orange County Opp. at 5–6.)    The Court, therefore, provides a brief summary of each of these cases, per its review of the respective dockets.

### A.  *In the Matter of the Application of The County of Rockland, et al., v. The City of New York, et al.*, C.A. No. 032065/2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023)

On May 9, 2023, Rockland County brought a combined Article 78 special proceeding/complaint to enjoin New York City from moving, allegedly without legal authority, 340 adult men seeking who are migrants and/or are seeking asylum under the New York City program, to the Armoni Inn & Suites located at 329 Route 303, Orangeburg, in the County of Rockland. (Feiden Decl., Exh. C.)  Rockland County brings claims against New York City, its officials, as well as certain hotels/motels for (i) violation of the N.Y. C.P.L.R.  7803(3) for having exceeded the scope of legal authority in proposing the transfer of homeless individuals outside of geographical boundaries of NYC pursuant to New York City's Executive Order 398; (ii) violation of the CPLR 7803(3) for having exceeded the scope of legal authority for enactment of NYC Executive Order 398; (iii) violation of the N.Y. C.P.L.R.  7803(3) for arbitrary and capricious decision making; (iv) N.Y. C.P.L.R. 3001, declaratory relief; and (v) N.Y. C.P.L.R.  6301, for a permanent injunction.  (*Id*.)

On May 11, 2023, the Supreme Court, Rockland County, granted an injunction temporarily restraining and enjoining New York City from transporting 340 homeless adult individuals

currently residing in a temporary shelter in New York City to the Armoni Hotel & Suites in Rockland. (Feiden Decl., Exh. E.) While the temporary restraining order was granted, a preliminary injunction application was pending and the parties were directed to appear before the Court for argument on May 30, 2023. (*Id*.) On May 12, 2023, the City brought an application by Order to Show Cause for leave to appeal from the State Court injunction to the Second Department. The Order to Show Cause was granted on May 12, 2023, with the current temporary restraining order remaining active, and the application made returnable on May 19, 2023. (Feiden Decl., Exh. F.)

**B.  *County of Orange v. Crossroads Hotel, et al*, C.A. No. 003107-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023), *removed on* May 21, 2023, C.A. No. 23-cv-4213**

In this lawsuit, which started in state court but was removed to federal court on May 21, 2023 (C.A. No. 23-cv-4213, ECF No. 1),  Orange County is seeking declaratory judgement to enforce its EO, as well as preliminary and permanent injunction against the hotels and motels in the Town of Newburgh that have presumably contracted with New York City to house homeless migrants for unknown periods of time without prior County or Town approval. (Nothnagle Decl., Exh. A, Complaint.)  Counsel for the hotels in this action has represented that the City of New York has sent 186 persons to Town of Newburgh hotels pursuant to the City's plans.  (Nothnagle Decl., Exh. B, Order to Show Cause with Temporary Restraining Order, dated May 16, 2023 and amended Order to Show Cause with Temporary Restraining Order, dated May 17, 2023.)  The Honorable Sandra B. Sciortino of the Supreme Court, Orange County issued a temporary restraining order on May 16, 2023, amended on May 17, 2023, forbidding the hotels at issue from accepting any more persons sent up by New York City pursuant to its program. (*Id*.) Individuals already at those hotels could remain at those locations pending a decision on the preliminary

injunction motion, which was still being briefed upon at the time that the case was removed to federal court.

The temporary restraining order appears to have expired as of May 31, 2023, and the case was removed to this Court.  A conference is being set to hear the parties' application to extend their temporary restraining order and to hear the Plaintiffs' request for leave to file a motion to remand back to state court.  (See C.A. No. 23-cv-4213, ECF No. 15.)

C.   *County of Orange v. City of New York, et al*, **C.A. No. 03109-2023 (Orange Cnty. Sup. Ct. filed on May 12, 2023)**

In this lawsuit, Orange County seeks, *inter alia*, a N.Y. CPLR Article 78 review of New York City's decision to transport migrants to the Town of Newburgh, Orange County pursuant to New York City's Executive Order 398.  (Nothnagle Decl., Exh. C.). Plaintiff Orange County raises the following causes of action against New York City, its officials, as well as two hotel/motels in Orange County: (i) an injunction based on the allegation that the respondents exceeded the scope of their legal authority based on the proposed transfer; (ii) an injunction based on the allegation that the respondents exceeded the scope of their legal authority based on the enactment of EO 398; (iii) an injunction based on the allegation that the New York City Respondents were arbitrary and capricious in their decision-making; (iv) declaratory relief; (v) permanent injunction.  (*Id.*)  The Honorable Sandra B. Sciortino of the Supreme Court, Orange County, issued an Order to Show Cause with a Temporary Restraining Order on May 16, 2023, amended on May 17, 2023, which forbade the City from transporting any more persons to the subject hotels in Newburgh pursuant to its plans, but allowing individuals already in Orange County to remain there.  (Nothnagle Decl., Exh. D.)

D.   *Town of Newburgh v. Newburgh EOM LLC, et al.*, **Index No. 003105-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023)**

14

In this lawsuit, which started in state court but was removed to federal court on May 21, 2023 (C.A. No. 23-cv-4212, ECF No. 1), the Town of Newburgh sets forth numerous purported violations of Town Laws as committed by Newburgh EOM LLC d/b/a Crossroads Hotel and is seeking, *inter alia*, declaratory judgment that the subject hotels are in violation of local zoning codes and an injunction from further violations thereof.  (Nothnagle Decl., Exh. E.)  The Honorable Sandra B. Sciortino of the Supreme Court, Orange County issued an Order to Show Cause with a Temporary Restraining Order on May 16, 2023, amended on May 17, 2023, prohibiting the hotels/motels from accepting any new persons under New York City's relocation program and forbidding the City from moving forward with said program.  (Nothnagle Decl., Exh. F.)

**E.**  ***Town of Orangetown v. Aromni Inn & Suites, LLC, et al.*, C.A. No. 032048- 2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023)**

In this lawsuit, the Town of Orangetown is seeking declaratory judgment and an injunction in order to enforce its own local zoning and occupancy codes against three hotel/motels, including Armoni Inn & Suites, which agreed to participate in the New York City program.  (Nothnagle Decl., Exh. J.)  On May 9, 2023, the Honorable Christie L. D'Alessio of the New York Supreme Court, Rockland County issued an Order to Show Cause with Temporary Restraining Order enjoining the hotel from modifying its premises pending proper applications and permits pursuant to Town zoning law.  (Nothnagle Decl., Exh. K.)

**F.**  ***Town of Colonie v. The City of New York, et al.*, C.A. No. 904641-2023 (Albany Cnty. Sup. Ct. filed May 27, 2023)**

The Town of Colonie commenced this action against New York City and Albany County asserting state law claims and seeking to prevent the operation of the SureStay Plus by Best Western Albany Airport as an unregulated homeless shelter. The Town asserts, *inter alia*, that the New York City Respondents only have authority to operate and create a homeless shelter in

accordance with Article 2-A of the Social Services Law and New York State Office of Temporary Disability and Assistance (OTDA) licensure requirements, which included plan submission and notice requirements that were not undertaken by New York City and Albany County.  (*See* C.A. No. 904641-2023, NYSCEF No. 2, Verified Petition and Complaint) On May 28, Albany County Supreme Court Justice Gerald W. Connolly issued a TRO that remains in effect at this time. (Parisi Decl., Exh. 7.)

### G.   *Town of Poughkeepsie v. South Road Hospitality LLC et al*., C.A No. 2023-51688 (Dutchess Cnty. Sup. Ct. filed May 19, 2023)

In this action, the Town of Poughkeepsie seeks to enjoin a Red Roof Plus hotel from being used, pursuant to New York City's program, as a location to provide up to four months of temporary shelter and other City-funded services in violation of Town Code § 210-13F. The defendants therein agreed on consent to refrain from transporting any homeless adult or minor individual residing in temporary shelter(s) in New York City to hotels within the Town of Colonie for the time being. That matter has since been removed to District Court, although the District Court (Hon. Phillip Halpern), has directed the parties to file letters as to why the Court should not remand this action for lack of subject matter jurisdiction.  (Parisi Decl., Exh. 8.)

### H.   *County of Onondaga v. City of New York et al*., C.A. No. 5214/2023 (Onondaga Cnty. Sup. Ct. filed May 22, 2023)

In this action, the County of Onondaga brings substantially similar claims as Orange County and Rockland County do in *County of Rockland et al. v. City of New York*, et al. (C.A. No. 032065/2023) and *County of Orange v. City of New York, et al.* (C.A. No. 03109/2023), where Onondaga brings claims against New York City, its officials, as well as certain hotels/motels for (i) violation of the N.Y. C.P.L.R.  7803(3) for having exceeded the scope of legal authority in proposing the transfer of homeless outside of geographical boundaries of New York City pursuant

to New York City's Executive Order 398; (ii) violation of the CPLR 7803(3) for having exceeded the scope of legal authority for enactment of NYC Executive Order 398; (iii) violation of the N.Y. C.P.L.R. 7803(3) for arbitrary and capricious decision making; (iv) N.Y. C.P.L.R. 3001, declaratory relief; and (v) N.Y. C.P.L.R. 6301, for a permanent injunction. (C.A. No. 5214/2023, NYSCEF No. 1, Petition.). On May 23, 2023, Onondaga Supreme Court Justice Robert E. Antonacci II issued a temporary restraining order enjoining the City of New York from transporting homeless adult individuals residing in a temporary shelter in New York City to hotels within Onondaga County. (Parisi Decl., Exh. 9.)

I. **_Town of Salina, New York v. CWP Syracuse I LLC_**, C.A. No. 5226/2023 (Onondaga Cnty. Sup. Ct. filed May 23, 2023)

In this action, the Town of Salina brings suit against a hotel for violations of its local zoning codes in connection with the hotel's agreement to house migrants and asylum seekers under the New York City's program. (_See_ C.A. No. 5226/2023, NYSCEF No. 1, Verified Complaint). On May 23, 2023, the Hon. Robert E. Antonacci II issued a temporary restraining order enjoining the use of the subject property as a long term residential facility until such use is approved by the Town of Selina and any other required governmental Authority. (Parisi Decl., Exh. 10.)

## LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief." _Winter v. Natural Resources Defense Council, Inc._, 555 U.S. 7, 22 (2008). "A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved'

by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)).

Where "a party seeks an injunction that will affect governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the plaintiff must typically show a likelihood of success on the merits—a serious question going to the merits is usually insufficient[.]" *Mullins*, 626 F.3d at 53. However, where a party seeks a mandatory injunction "altering, rather than maintaining, the status quo," such as in this case, that party "must meet [a] more rigorous standard." *Almontaser v. N. Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008) (internal alterations omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33 (2d Cir. 1995) ("[W]e have required the movant to meet a higher standard where ... an injunction will alter, rather than maintain, the status quo . . .."). The moving party must establish "a clear showing that the moving party is entitled to the relief requested," or show that "extreme or very serious damage" would result in the absence of preliminary relief. *Tom Doherty Assocs.*, 60 F.3d at 34.

## DISCUSSION

The parties frame the central issue herein in two different ways. As made clear during oral argument and in their opposition papers, Defendants frame the central question as follows: whether New York City abrogated New York state law by unilaterally instituting a program of transporting and setting up "homeless shelters" for migrants and asylum-seekers, therefore justifying the issuance of the Rockland and Orange County EOs. The Plaintiffs frame the issue differently: whether the EOs violate the constitutional and federal civil rights of the migrants and asylum seekers.

Both questions are interesting in light of the ongoing migrant crisis in New York State. But the only question before the Court is the one presented by the Plaintiffs. Whether New York

City violated New York laws by instituting its program is not the question presented before this Court, and is instead properly being disputed in state court. *See In the Matter of the Application of The County of Rockland, et al., v. The City of New York, et al*., C.A. No. 032065/2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023); *County of Orange v. City of New York, et al*, C.A. No. EF003109-2023 (Orange County Sup. Ct. filed on May 12, 2023). The Court notes that it is possible that the New York and the Rockland and Orange County EO's could all be impermissible for different reasons – these are not different sides of the same coin. Here, the Court will focus on the central question properly presented herein: whether the EOs impermissibly violate the federal civil and constitutional rights of migrants and asylum seekers.

For the reasons discussed below, the Court finds that the instant action is not mooted as to any of the named Plaintiffs, nor is abstention warranted. The Court also GRANTS Plaintiffs' preliminary injunction application.

## I. MOOTNESS

The Orange County Defendant avers that with respect to the four Plaintiffs who are already in Orange County (Plaintiffs Deide, Din, Salem, and Neira), their claims are moot because "they have already received the relief they seek" by virtue of a state court temporary restraining order against New York City that allows the four to remain in Orange for the pendency of the order. (*See* Orange Opp. at 14.) The Orange County Defendant does not explain which of the state court actions it refers to, but presumably, it speaks of *County of Orange v. Crossroads Hotel, et al, Orange County*, where the Honorable Sandra B. Sciortino of the New York State Supreme Court issued a temporary restraining order on May 16, 2023 and an amended restraining order on May 17, 2023 forbidding New York City from going forward with its program to move migrants to hotels in Orange County, but allowing persons already in Orange County to stay there. *See*

Nothnagle Decl., Exh. B, copies of May 16, 2023 and May 17, 2023 TRO and amended TRO in County of Orange *v. Crossroads Hotel, et al, Orange County*, Orange Changing Supreme C.A. No EF003107-2023 (filed May 12, 2023), removed on May 21, 2023, *County of Orange v. The Crossroads Hotel et al*, C.A. No. 23-cv-04213.

Under the "case or controversy" requirement of Article III of the Constitution, "at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001). A case is moot, and therefore no longer a case or controversy for the purposes of Article III, "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013) (internal quotation marks omitted). When a case becomes moot, a district court no longer has subject matter jurisdiction, *see Fox v. Bd. of Trs. of State Univ. of N.Y*., 42 F.3d 135, 140 (2d Cir. 1994), and courts may consider whether they have subject matter jurisdiction *sua sponte* at any stage of the litigation. *See Fed. Dep. Ins. Corp. v. Four Star Holding Co*., 178 F.3d 97, 100 n.2 (2d Cir. 1999).

The Court agrees with Plaintiffs that the controversy is not moot as to the four Plaintiffs in Orange County. As Plaintiffs correctly point out, the Orange County Defendant has made no representation to this Court that it does not intend to enforce its order once the temporary restraining order expires. *See Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 255 (S.D.N.Y. 2020) ("Where, as here, Defendants may later resume the challenged conduct, an injunction provides effectual relief because it precludes the defendant from reviving the challenged conduct." (cleaned up)). Therefore, the Court rejects the Orange County Defendant's mootness argument.

## II.   ABSTENTION

The Defendants argue that the Court should abstain from rendering a decision on the preliminary injunction motion in light of the pending state court actions described above.  (Orange County Opp. at 4.)  The Orange County Defendant argues that the Plaintiffs in this matter are seeking intervention by a federal court where the state court has already exercised jurisdiction and issued temporary restraining orders to prohibit New York City from sending, and the subject hotels from receiving, additional persons under the migrant/asylum seekers housing programs.  (*Id.*)

"[A]bstention is generally disfavored, and federal courts have virtually unflagging obligation to exercise their jurisdiction." *Niagra Mohawk Power Corp. v. Hudson River-Black River Regulating Dist*., 673 F.3d 84, 100 (2d Cir. 2012) (internal quotation marks omitted); *see also Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591(2013) ("Jurisdiction existing, this Court has cautioned, a federal court's obligation to hear and decide a case is virtually unflagging." (internal quotation marks omitted)).  Thus, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States."  *New Orleans Public Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 368 (1989).

The Court considers the parties' abstention arguments, and for the following reasons, finds that abstention is not warranted.[1]

### A.  *Younger* Abstention

The Rockland County Defendant argues that the Court should abstain from rendering a decision pursuant to the *Younger* abstention doctrine.  (*See* Rockland ECF No. 23).   For the reasons articulated below, the Court disagrees.

---

[1]      While counsel for the Rockland County Defendant indicated during the oral argument that the *Rooker Feldman* doctrine may apply, no briefing was provided in the initial opposition papers nor in the supplemental papers on abstention.  The Court will therefore not consider whether the *Rooker Feldman* doctrine applies.

The Supreme Court has recently reiterated Younger's narrow scope, cautioning that abstention is only warranted for three kinds of state proceedings: "(1) pending state criminal proceedings; (2) civil enforcement proceedings that are akin to criminal prosecutions; and (3) civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts." *Schorr v. DoPico*, 686 Fed. App'x. 34, 36 (2d Cir. 2017) (summary order) (internal quotation marks omitted) (citing *Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)). In sum, "federal courts must abstain from exercising subject matter jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Wilson v. Emond,* 373 Fed. App'x. 98, 100 (2d Cir. 2010).

None of the pending lawsuits initiated in state court involved criminal prosecutions, civil proceedings that are akin to criminal prosecutions, or state civil proceedings that involve the ability of state courts to perform their judicial functions.  Nor does this Court view that its decision herein would call into question ongoing state proceedings.  The only potential case at issue that involved one the EOs in this instant action is *County of Orange v. Crossroads Hotel, et al*, C.A. No. EF003107-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023), removed on May 21, 2023, C.A. No. 23-cv-4212, where Orange County seeks to enforce its EO and had obtained a temporary restraining order.  However, the TRO has expired as of May 31, 2023, and the case has since been removed to this Court.  There is currently no pending temporary restraining order in that case, and therefore, a decision rendered herein would not conflict with any order of the state court.

Moreover, "this Court is not being asked to enjoin any state proceedings." *United States v. Scali,* No. 16-CR-466 (NSR), 2018 WL 369195, at *2 (S.D.N.Y. Jan. 9, 2018), *aff'd*, 820 F. App'x 23 (2d Cir. 2020).  The scope of this instant lawsuit is whether the challenged EOs are unconstitutional and/or violate federal civil rights laws and should therefore be barred from

enforcement.  This case does not evaluate the legality of the New York City program, which is at issue in several of the state court proceedings, nor does the Court wish to opine or interfere with those proceedings and the orders issued by the state courts therein.  *See County of Orange v. City of New York, et al.*, C.A. No. EF003109-2023 (Orange Cnty. Sup. Ct. filed on May 12, 2023); *In the Matter of the Application of The County of Rockland, et al*., v. The City of New York, et al., C.A. No. 032065/2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023).

As the Court has explained above, it is possible to find that both the EOs and the New York City program are unlawful, and whether the latter is true or not is not something the Court will decide on.  Nor will the Court's decision on the instant application influence the ongoing proceedings which pertain to the enforcement of municipal zoning laws in several towns.  *See, e.g., Town of Newburgh v. Newburgh EOM LLC, et al*., Index No. EF003105-2023 (Orange Cnty. Sup. Ct. filed May 12, 2023); *Town of Orangetown v. Aromni Inn & Suites, LLC, et al*., C.A. No. 032048- 2023 (Rockland Cnty. Sup. Ct. filed May 9, 2023).  Again, whether the Court finds that Plaintiffs establish a substantial likelihood of success that the Rockland and Orange County EOs are unlawful has nothing to do with the legality of municipal zoning codes, which are not at issue here, and which the towns seek to enforce in their lawsuits.

For the aforementioned reason, the Court finds that *Younger* abstention does not apply herein.

### B.  *Burford* Abstention

The Orange County Defendant argues that *Burford* abstention should apply.  Under the doctrine, federal courts should abstain rather than "interfere with the orders or proceedings of state administrative agencies: (1) if there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2)

if the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998) (internal quotations omitted). *Burford* "abstention is appropriate when a federal case presents a difficult issue of state law . . . for which the state has provided a comprehensive regulatory system with channels for review by state courts or agencies." *All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 599 (2d Cir. 1988).

Here, the Court need not abstain under *Burford* as this matter does not deal with proceedings or orders of state administrative agencies. *See State Farm Mut. Auto. Ins. Co. v. Schepp*, 616 F. Supp. 2d 340, 346 (E.D.N.Y. 2008) ("*Burford* abstention, however, does not apply in this case because the doctrine prevents federal courts from interfer[ing] with the proceedings or orders of state administrative agencies in certain circumstances, and the present action does not relate to any administrative action undertaken by the State of New York, much less an order or proceeding of a state agency.") (internal quotation and citations omitted).

The Orange County Defendant nonetheless argues that the matters that were initiated in Orange and Rockland Supreme Court impact the "the ability of a local municipality to enforce its zoning laws, for a municipality and Counties to enforce its Executive Orders in declared state of emergencies under their local codes, charters and NYS Executive Law, and the implications of New York City's self-proclaimed migrant crisis on NYS Social Services Law and related administrative decisions governing the housing of the homeless across a district's own borders." (Orange County Opp. at 6.)  The Orange County Defendant cites to *Canaday v. Koch*, 608 F. Supp. 1460, 1469 (S.D.N.Y. 1985), *aff'd sub nom. Cannady v. Valentin*, 768 F.2d 501 (2d Cir. 1985) [internal citations omitted], where homeless mothers brought constitutional claims against New York City and the Commissioners of New York City Human Resources Administration and New

York State Department of Social Services after claiming to have been denied lawful emergency housing by city and state officials.  (Orange County Opp. at 7.)  The court found that "allocation of resources for welfare programs is a task uniquely within the sphere of local control." *See Canaday*, 608 F. Supp. 1460 at 1469–70 (internal citations omitted).

As discussed above, the scope of the application herein, as indicated by counsel during oral argument and as reflected in the moving papers, is limited to whether the EOs impermissibly violate constitutional and civil rights of the Plaintiffs.  Because the Court does not attempt to opine on any zoning law, homeless or migrant shelter protocol, or state social services laws, *Burford* abstention is not warranted.

### C.  *Pullman* Doctrine

Next, the Orange County Defendant argues that the Court should abstain from rendering a decision under the *Pullman* doctrine.  In the Second Circuit, "[a]bstention under the *Pullman* doctrine may be appropriate when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible to an interpretation by a state court that would avoid or modify the federal constitutional issue."  *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir. 2000) (emphasis added) (internal quotation marks omitted).

The Orange County Defendant argues that the "state statutes in question, as applied to Executive Orders related to homeless migrants, are unclear and are the very issues currently before the state courts in Orange and Rockland County."  (Orange County Opp. at 13.)  As explained above, the Court is not evaluating the validity nor is it interpreting any state statute relating to homelessness or migrants.  Whether the state courts find that the New York City program violate New York law is a different question from whether the EOs are expressly discriminatory and

whether they were issued with invidious discriminatory motives.  Because the Court's review will not interpret state statutory law regarding homelessness and migration, *Pullman* abstention is not warranted.

### D.  *Colorado River* **Abstention**

Finally, the Orange County Defendant argues that *Colorado River* abstention is appropriate.  (*See* Orange County Opp. at 8.).  *Colorado River* abstention applies only "in those 'exceptional circumstances' where concurrent state-court litigation could result in 'comprehensive disposition of litigation.'" *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 116 (2d Cir. 1998) (quoting *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 817 (1976)).  The Second Circuit has stated that "[f]ederal and state proceedings are 'concurrent' . . . for purposes of abstention when . . . there is an identity of parties, and the issues and relief sought are the same." *Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 22 (2d Cir. 1997).  In other words, courts first need to determine whether the cases federal and state cases are concurrent and parallel.  *See Shields v. Murdoch*, 891 F. Supp. 2d 567, 579 (S.D.N.Y. 2012) ("If the federal and state cases are not parallel . . . *Colorado River* abstention does not apply, whether or not issues of state law must be decided by the federal court") (internal quotation and citation omitted); *see also Dittmer*, 146 F.3d at 118 ("a finding that the concurrent proceedings are "parallel" is a necessary prerequisite to abstention under Colorado River.").

Furthermore, *Colorado River* abstention requires an ad hoc balancing of a number of factors, which are: (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal actions will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one

forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiffs federal rights.  *Highview Properties D.H F. Inc. v. Town of Monroe*, 606 F. Supp. 3d 5, 29 (S.D.N.Y. 2022) (citing *Woodford v. County Action Agency of Greene County*, 239 F.3d 517, 522 (2d. Cir. 2001).

The Court agrees with Plaintiffs that, as a threshold matter, the instant action is not parallel to the state court proceedings cited by Defendants.  (*See* Pls.' Supp. Mem at 10–11.)   "Federal and state proceedings are 'concurrent' or 'parallel' for purposes of abstention when the [] proceedings are essentially the same; that is, there is an identity of parties, and the issues and relief sought are the same."  *See Nat'l Union Fire Ins. Co. v. Karp*, 108 F.3d 17, 22 (2d Cir. 1997).

Here, the Plaintiffs are not parties to any of the state court actions that Defendants elevate. *See Pappas Harris Cap., LLC v. Bregal Partners, L.P.*, No. 20-CV-6911 (VEC), 2021 WL 3173429, at *7 (S.D.N.Y. July 27, 2021) ("[*Colorado River*] abstention is not appropriate when none of the federal plaintiffs is present in the state case.", *appeal dismissed*, No. 21-2086, 2021 WL 7162177 (2d Cir. Sept. 29, 2021).  Nor do the state court cases grapple with the question of whether the Rockland County and Orange County EOs violate migrant and asylum seekers' constitutional and federal civil rights.  Instead, those actions seek different relief and raise different questions, including whether New York City is violating New York law by instituting its migrant program, or whether certain municipalities may enforce their local zoning codes and ordinances against motels/hotels that are temporarily housing migrants.

In their supplemental briefing, Defendants state that the state court actions "will dispose of all claims presented in the instant federal case," and that in particular, "[a]s made evident by the proceedings thus far in the *County of Rockland et al. v. City of New York*, et al. (C.A. No. 032065/2023) and *County of Orange v. City of New York, et al*. (C.A. No. 03109/2023) matter,

questions of the constitutionality of the County Executive Orders will be resolved." (Defs.' Supp. Mem. at 12.) The Court disagrees with Defendants' argument that the constitutionality of the EOs will be resolved. The focus of the *County of Rockland et al. v. City of New York* and *County of Orange v. City of New York* is on the legality of New York City's program. While counsel for the motel/hotels in *County of Rockland et al. v. City of New York* argued during the May 11, 2023 oral argument on the order to show cause with temporary restraints that the actions taken by Rockland County violate the constitution and federal preemption doctrine (*see* C.A No. 32065/2023, NYSCEF Doc. No. 26 at Tr. 16:22-18:6), Orange County's counsel reminded the Court that its "papers don't discuss the people. It only discusses the City's -- accepting their class as homelessness and the cost of homelessness." (*Id*. at Tr 18:9–11.) There has otherwise been no clear indication in those dockets that the state courts will adjudicate the constitutionality of the Rockland and Orange County EOs.

While the Court recognizes that all of the cases pertain to the New York City program, the state court cases contend with different questions and different laws that are not at issue in this instant action. Therefore, the Court finds that the instant action is not parallel to the state court actions. *See Dittmer*, 146 F.3d at 118 (holding that *Colorado River* abstention was unwarranted "[b]ecause none of the plaintiffs in the present action [were] parties to the state case" and "because the present action involve[d] issues of federal law only"); *see also All. of Am. Insurers v. Cuomo*, 854 F.2d 591, 603 (2d Cir. 1988) ("While there may be some overlap of subject matter, it is not sufficient to make these actions concurrent. Such differences in parties and issues are strong factors against invoking exceptional circumstances as the basis for dismissal [under the *Colorado River* doctrine]").

Because Defendants failed to show that the instant case is parallel to the state court actions, the Court need not consider whether the *Colorado River* factors weigh decidedly against abstention.

### III.   PRELIMINARY INJUNCTION

#### A.  Likelihood of Success on the Merits

Plaintiffs seek an interim injunction with respect to the following claims (i) violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution (insofar as it relates to interstate commerce); (ii) violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; (iii) violation of the Supremacy Clause of the U.S. Constitution; (iv) violation of Title II of the Civil Rights Act of 1964, 42 U.S.C § 2000a et seq; and (vii) violation of 42 U.S.C. § 1981.  (*See* ECF No. 11).  They do not appear to seek preliminary injunctive relief with respect to their state law claims under N.Y. Executive Law § 24 and N.Y. Executive Law § 296(2)(a).

The Court will now evaluate the likelihood of success on the merits for each of the federal claims.

#### 1.  Equal Protection

Plaintiffs argue that the challenged EOs discriminate against them on the basis of their national origin, alienage, and race, therefore violating their equal protection rights under the Fourteenth Amendment.  (Pls.' Mem. at 15.)

Under the Equal Protection Clause, classifications based on race, national origin, or alienage are subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest.  *See City of Cleburne, Tex. v. Cleburne Living Ctr*., 473 U.S. 432, 440 (1985) ("[W]hen a statute classifies by race, alienage, or national origin" it is "subjected to strict scrutiny . . . ."); *see*

*also Graham v. Richardson*, 403 U.S. 365, 371–72 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *Dandamudi v. Tisch*, 686 F.3d 66, 77 (2d Cir. 2012) ("[T]he Fourteenth Amendment is written broadly as protecting all persons and that aliens necessarily constitute a discrete and insular minority because of their impotence in the political process, and the long history of invidious discrimination against them.") (internal quotations omitted).

To trigger strict scrutiny, the plaintiff must allege that a government actor intentionally discriminated against him or her on the basis of race, national origin, or alienage. *See Jana-Rock Const., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976); *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir.1999)); *City of Cleburne, Tex.*, 473 U.S. at 440. To demonstrate this intentional discrimination, plaintiffs can "point to a law or policy that expressly classifies persons on the basis of race," "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner," or "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000) (internal citations omitted). "When the government expressly classifies persons on the basis of race or national origin . . . its action is 'immediately suspect.'" *Jana-Rock*, 438 F.3d at 204–05 (quoting *Johnson v. California*, 543 U.S. 499, 509 (2005)); *see also Shaw v. Reno*, 509 U.S. 630, 642–43 (1993). Where such express classification is present, the plaintiff "need not make an extrinsic showing of discriminatory animus or a discriminatory effect to trigger strict scrutiny." *Jana-Rock*, 438 F.3d at 205; *see also Shaw*, 509 U.S. at 642 ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute."). Instead,

"[t]he burden of proof shifts, strict scrutiny applies, and under strict scrutiny, the government defending the constitutionality of the law has the burden of proving that racial classifications are narrowly tailored measures that further compelling governmental interests." *Jana-Rock*, 438 F.3d at 205 (internal citations and quotations omitted).

A plaintiff could also show intentional discrimination where "a discriminatory purpose [was] a motivating factor" in the government's action. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977); *see also Brown*, 221 F.3d at 337. Discriminatory purpose can be demonstrated by "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266; *see also Centro Presente v. U.S. Dep't of Homeland Sec*., 332 F. Supp. 3d 393, 415 (D. Mass. 2018) ("[T]he combination of a disparate impact on particular racial groups, statements of animus by people plausibly alleged to be involved in the decision-making process, and an allegedly unreasoned shift in policy [is] sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision."); *see also Vill. of Arlington Heights*, 429 U.S at 268 (noting that "contemporary statements" of relevant decision makers can demonstrate racially discriminatory intent); *see also Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 608-609 (2d Cir. 2016) (stating that "[r]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications" even without the use of "explicitly racial language").

### a. Whether the EOs intentionally discriminate against Plaintiffs

The Court will first evaluate whether the challenged EOs trigger strict scrutiny. Plaintiffs proceed on two theories: (i) that the Orange and Rockland County EOs are on their face intentionally discriminatory because they expressly classify persons based on national origin and

alienage (*see* Pls.' Mem. at 16); and (ii) that the Orange and Rockland County EOs were issued with discriminatory purposes. (*id*. at 18-19.). The Court will assess each of these theories.

### i.   Orange County EO

The Court agrees with Plaintiff that the Orange County EO on its face expressly classifies persons based on national origin and alienage, and is therefore "immediately suspect," thereby triggering strict scrutiny. The contemporaneous comments made by the Orange County Defendant also suggests that the EOs were issued for discriminatory purposes, further supporting a finding that strict scrutiny should be triggered.

First, the Orange County EO explicitly states that "all hotels, motels and/or any facilities allowing short-term rentals do not contract and/or accept said *migrants and/or asylum seekers* for long-term housing within Orange County. (Orange County EO) (emphasis added). That "said migrants and/or asylum seekers" refers to those individuals being transported by New York City under its program does not obscure the fact that the EO explicitly refers to a specific group of people defined by their alienage status and explicitly bars them from being housed in hotels, motels and short-term rental facilities in order to receive long-term housing within Orange County. *See, e.g., Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000) (strict scrutiny is triggered where a plaintiff could point to a law or policy that "expressly classifies persons on the basis of race.")

Second, the record shows that the desire to exclude migrants and asylum seekers into the community was a motivating factor when issuing the EO. The Supreme Court has recognized that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. 555. Contemporaneous comments made by the

Orange County Defendant included "these people" and "are they going to be walking around your kid's elementary school" and "I am opposed to these asylum seekers being sent to our communities." (Belsher Decl., Exhs. 6 and 16). Racially-charged language "can be evidence that official action was motivated by unlawful discriminatory purposes." *See Saget v. Trump*, 375 F. Supp. 3d 280, 372 (E.D.N.Y. 2019). These comments strongly suggest that discriminatory motive was a factor in issuing the EO, as such comments were made by a decision-maker. *See Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 415 (D. Mass. 2018).

        ii.    **Rockland County EO**

The Court similarly agrees with Plaintiffs that the Rockland County EO triggers strict scrutiny because it expressly classifies persons based on national origin and alienage and contemporaneous, racially-charged comments made by the Rockland County Defendant suggests discriminatory motive in the issuance of the Rockland EO.

First, despite its recent amendments, the Rockland County EO still expressly classifies migrants and asylum seekers, thereby triggering strict scrutiny. On one hand, the Rockland EO states that "it shall not be read to have the purpose of barring any person, including migrants or asylum seekers, from traveling to or residing in the County." (Rockland EO at 2.) The Rockland EO also amended its language to refer to the transport of "persons *including but not limited* to migrants or asylum seekers" (*id*. § 1(A) (emphasis added)) and the provision of "housing or accommodations for any persons, *including but not limited* to migrants or asylum seekers or otherwise …". (*Id*. § 1(B)) (emphasis added)). Plaintiffs call these changes "cosmetic." (Reply at 2.) While the language does appear to be an attempt to make the EO more neutral-sounding, it is clear that the focus of the EO is still as to the migrants and asylum seekers being transported into Rockland County via the New York City program. The EO refers specifically to the New York

City program (*see* Rockland EO § (1)(F)(1) and specifically authorizes the Rockland County
Sheriff to "make limited stops to notify persons suspected of transporting migrants or asylum
seekers into the County in violation of . . . this Emergency Order, and to similarly, notify the
owners and operators of facilities suspected of housing any migrants or asylum seekers . . .").
Because the EO classifies a group of individuals, it is immediately suspect and therefore subject
to strict scrutiny.

Contemporaneous statements made by the Rockland County Defendant also suggest that
there was discriminatory motive behind the issuance of the EO.  According to the record, the
comments made by the Rockland County Defendant appear even more disparaging and racially-
charged than those made by the Orange County Defendant.  For example, the Rockland County
Defendant reportedly made comments such as "within that cadre of people who are not vetted, we
have child rapists, we have criminals," and, referring a Latin-American gang, "we have MS-13."
(Belsher Decl., Exh. 7.)  The Rockland County Defendant also made comments on his Facebook
page stating that he would not permit the program to "destroy this county," that he hopes to "end[]
this threat to our community," that he was working to "protect the rights of our citizens and the
character of your community," and that this was a "battle to protect our community"  (Belsher
Decl., Exh. 19.)  The Rockland County Defendant also reportedly stated in a press conference that
the New York City program was "diverting busloads of undocumented individuals to [Rockland]
County . . . [which] only incentiviz[e]s illegal immigration which does nothing to support . . .
hardworking citizens."  (Belsher Decl., Exh. 15.)  *See Funtana Vill., Inc. v. City of Panama City
Beach*, No. 5:15CV282-MW/GRJ, 2016 WL 375102, at *11 (N.D. Fla. Jan. 28, 2016) ("[C]ertain
facially non-discriminatory terms can invoke racist concepts that are already planted in the public
consciousness—words like 'welfare queen,' 'terrorist,' 'thug,' 'illegal alien'").  As with the Orange

County EO, the fact that these comments were made by a Rockland County decision-maker carries weight in indicating the existence of discriminatory motive during the issuance of the Rockland EO. *See Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 609 (2d Cir. 2016) ("[R]acially charged code words may provide evidence of discriminatory intent by sending a clear message and carrying the distinct tone of racial motivations and implications.").

Even during oral argument, counsel for the Rockland County Defendant indicated that financial concerns was just one consideration, but concerns regarding "life, liberty, and property," was another major concern. When asked what counsel meant by "life, liberty, and property," counsel indicated that there would be public safety concerns, and repeated that the having "340 single unemployed men" come in through the program would cause "mayhem." No further satisfactory explanation was given by counsel when asked to explain what was meant by "mayhem" or where the basis for that concern came from. Therefore, based on the record, the Court agrees with Plaintiffs that there is enough on the record and as reflected during the oral argument that invidious, discriminatory concerns was one of the motivating factors for the issuance of the Rockland EO.

### b. Whether the Rockland and Orange EOs pass strict scrutiny

Seeing that the Rockland and Orange County EOs trigger strict scrutiny, the Court will now evaluate whether the EOs are narrowly tailored to serve a compelling state interest. For the following reasons, the Court finds that the EOs do not pass strict scrutiny.

Rockland and Orange Counties both justify their EOs by stating that they were issued to preserve their resources and to stop New York City from implementing its unlawful program. With respect to the first concern regarding the preservation of resources, the parties agree that New York City has promised to provide the migrants and asylum seekers with shelter, food, and

healthcare for the first four months of arrival.  (Pls.' Mem. at 19.)  Rockland and Orange County fear that after the four months are over, they will be essential be left with the consequences of taking care of the migrants and asylum seekers and will have to expend their own local resources to do so.

The Court agrees with Plaintiffs that based on the information available, the fear that "thousands" of migrants/asylum seekers will influx the Rockland and Orange County communities is speculative, as the record shows that New York City's plan includes relocation of about 300 people to the two counties.  (*See* Belsher Decl., Exh. 4.)  The Defendants' fear that they will have to expend their own resources once New York City stops providing for the migrants is contradicted by the Counties themselves, as both have indicated that undocumented people are not eligible for their county resources.  (*See* Belsher Decl., Exh. 8, Rockland County Press Release, dated May 5, 2023 ("Social Services funding is also not applicable to undocumented individuals, so we have no financial support to help those without a legal status."); (Orange County EO ("There is no legal basis to provide adequate services to these migrants or asylum seekers by the County's Department of Social Services because of their age and immigration status.").  In addition, the Defendants do not address the fact that New York Governor Hochul's declaration of a state of emergency, EO 28, dated May 9, 2023, expressly provides for the provision of resources to affected local governments that respond to the migrant crisis.  (*See* Belsher, Decl., Exh. 9 ("direct[ing] the implementation of the State Comprehensive Emergency Management Plan and authorize, effective May 9, 2023, State agencies as necessary, and the American Red Cross, to take appropriate action to protect State property and to assist affected local governments and individuals in responding to and recovering from this disaster, and to provide such other assistance as necessary to protect the public health and safety.").

Even if there was a compelling government interest, neither of the challenged EOs are narrowly tailored to address the concern of preserving resources.  Both orders broadly bar transport and housing for any migrant or asylum seekers regardless of whether those individuals will stay beyond the four-month period, and regardless of whether the migrants or asylum seekers actually anticipate seeking social services.  In any event, despite any legitimate concern to preserve financial resources, local governments "may not accomplish such a purpose by invidious distinctions between classes of its citizens."  *Shapiro v. Thompson*, 394 U.S. 618, 633, 89 S. Ct. 1322, 1330, 22 L. Ed. 2d 600 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)

Lastly, the Defendants claim an interest in preventing the establishment of temporary shelters, which they argue were implemented unlawfully by New York City.  (Rockland County Opp. at 19; Orange County Opp. at 23.)  Similar to the above, while such concern could be legitimate, it cannot be addressed through discriminatory means.  Nor are the EOs limited to establishments that are "temporary shelters" or "homeless shelters."  The Orange County EO broadly bars "all hotels, motels, and/or any facilities" from allowing long-term housing to migrants or asylum seekers.  The EO is not limited to establishments or types of housing that could be considered homeless and/or shelters under New York law, and instead, could apply to other sorts of lodgings (*i.e.* lodgings like short-term vacation homes and Airbnbs).  The EO also does not appear to be limited to the New York City program.  Nor is the term "long-term" defined.

The Rockland County EO similarly broadly applies to "hotel, motel, or owner of a dwelling or non-swelling structure converted to a dwelling or shelter in Rockland County," but does not expressly limit the EO to establishment that could be considered homeless/temporary shelters under New York law, which is purportedly the main concern articulated by the Rockland County

Defendant.  Therefore, the EOs cannot be considered narrowly tailored to address the Defendants'
concerns.

For the aforementioned reasons, the Court finds that Plaintiffs have established a
substantial likelihood of success on the merits for their Equal Protection claim.[2]

## 2. 42 U.S.C. § 1981

Plaintiffs invoke 42 U.S.C. § 1983 to allege a violation of her civil rights guaranteed under
42 U.S.C. § 1981 ("Section 1981").  (AC ¶¶ 39, 48.)  Plaintiffs argue that the Rockland and Orange
County EOs violate Section 1981, which in relevant part provides that "[a]ll persons within the
jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as
is enjoyed by white citizens."  For the reasons articulated below, the Court finds that Plaintiffs
have established a substantial likelihood of success on the merits with respect to their Section 1981
claim.

In order to establish a Section 1981 violation, each Plaintiff must allege that (1) he is an
alien; (2) the Defendants intended to discriminate against him on the basis of alienage; and (3) the

---

[2]     The Defendants argue that Plaintiffs' Equal Protection claim fails because they fail to set forth any evidence
that they were treated differently than others similarly situated.  (Orange County Opp. at 22; Rockland County Opp.
19-20).  Plaintiffs alleging equal protection claims based on a theory of selective adverse treatment are required to
show that they were treated differently compared with other similarly situated individuals.  *See Hu v. City of New
York*, 927 F.3d 81, 91 (2d Cir. 2019); *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760, 785 (W.D.N.Y. 2020).
Here Plaintiffs do not proceed on a selective treatment theory, and rather, proceed on a theory that the EOs are facially
discriminatory and that they were issued with discriminatory motive.  Therefore, Defendants' arguments that Plaintiffs
fail to offer evidence regarding similarly situated individuals is irrelevant.  *See Brown v. City of Oneonta, New York*,
221 F.3d 329, 337 (2d Cir. 2000) ("Plaintiffs are correct, however, that it is not necessary to plead the existence of a
similarly situated non-minority group when challenging a law or policy that contains an express, racial classification.
These classifications are subject to strict judicial scrutiny, and strict scrutiny analysis in effect addresses the question
of whether people of different races are similarly situated with regard to the law or policy at issue.") (internal citation
omitted).

discrimination concerned one of Section 1981's enumerated activities. *See Osuan v. City of New York*, No. 18CV151, 2019 WL 2544866, at *1 (S.D.N.Y. June 20, 2019). Courts in the Second Circuit have found that third party beneficiaries to a contractual relationship may bring Section 1981 claims. *See Olzman v. Lake Hills Swim Club, Inc*., 495 F.2d 1333, 1339 (2d Cir.1974); *Macedonia Church v. Lancaster Hotel Ltd. P'ship*, 560 F. Supp. 2d 175, 180 (D. Conn. 2008); *Anders v. Verizon Servs. Corp*., No. 09 Civ. 8919 (DLC), 2011 WL 5837239, at *2–3 (S.D.N.Y. Nov. 18, 2011). Several other circuit courts have also recognized that third-party beneficiaries to contracts have rights under Section 1981. *See, e.g., Denny v. Elizabeth Arden Salons, Inc*., 456 F.3d 427, 436 (4th Cir. 2006); *Hampton v. Dillard Department Stores, Inc*., 247 F.3d 1091, 1118–19 (10th Cir. 2001); *Jones v. Local 520, Intern. Union of Operating Engineers*, 603 F.2d 664, 665–66 (7th Cir. 1979).

On the first element of their Section 1981 claim, the Court finds that each Plaintiff sufficiently establishes that he is an alien, and the Defendants do not dispute otherwise. (*See* Chavez Decl. ¶ 3 ("plaintiffs are migrants who recently arrived to the United States seeking refuge from their countries of origin."). The Orange County Defendant appears to indicate that Section 1981 only applies to racial discrimination, and argue that because no affidavit from any Plaintiff gives information as to their race or background, they fail on the first element. (Orange County Opp. at 24.) While the Court recognizes that many Section 1981 cases deal with racial discrimination, it has also been established in this Circuit that alienage discrimination can form the basis for a Section 1981 claim. *See Anderson v. Conboy*, 156 F.3d 167, 171, 175 (2d Cir. 1998) (finding that Section 1981 prohibits alienage discrimination with respect to right to make and enforce contracts.); *see also Hooda v. Brookhaven Nat. Lab'y*, 659 F. Supp. 2d 382, 391 (E.D.N.Y. 2009) ("[Section] 1981 protects only against retaliation or discrimination based upon

characteristics such as race or alienage." (citing 42 U.S.C. § 1981(a) and *Anderson v. Conboy*, 156 F.3d 167 (2d Cir.1998)).

Skipping to the third element of Plaintiffs' Section 1981 claim, the Court finds this element to be satisfied.  Plaintiffs' Section 1981 claim is based on its argument that each of the challenged EOs "impairs contracts with those seeking to provide housing to migrants."  (Reply at 10; *see also* Pls.' Mem. at 22 ("the executive orders . . . seek to negate contracts entered into by New York City to provide housing for the plaintiffs.").   The Court agrees with Plaintiffs that it is clear that the EOs each seek to impair the contracts made between New York City and the local hotels/motels. Therefore the challenged conduct falls within Section 1981, which protects against impairments in the making and enforcement of contracts.  Several provisions in the EOs make this clear:

> "No municipality may make contracts with persons, businesses, or entities doing business within the County to transport persons, including but not limited to migrants or asylum she to locations in the County, or to house or shelter such persons at locations in the County for any length of time without the municipality obtaining the express, written permission of the County Executive."

*See* Rockland EO, at § 1(A)

> "No hotel, motel, or owner of a dwelling or non-dwelling structure converted to a dwelling or shelter in Rockland County is permitted to contract or otherwise engage in business with any municipality other than the County of Rockland (an external municipality") for the purpose of providing housing or accommodations for any persons, including but not limited to migrants or asylum seekers or otherwise without a license granted by the County."

*Id*. at § 1(B)

> "[A]ll hotels, motels and/or any facilities allowing short term rentals do not contract and/or accept said migrants and/or asylum seekers for long-term housing within Orange County."

*See* Orange County EO.

The fact that Plaintiffs are third-party beneficiaries does not bar their Section 1981 claim, because as indicated above, Section 1981 claims are available to third party beneficiaries. *See Macedonia Church*, 560 F. Supp. 2d at 180; *Anders*, 2011 WL 5837239, at *2–3.

The second element is the most contentious, where the parties disagree regarding whether the Executive Orders issued by the Defendants intentionally discriminates against Plaintiffs based on their alienage.   As indicated above, *see supra* III.A.1.a–b, the Court finds that Plaintiffs established a substantial likelihood of success in their claim that the EOs were issues with discriminatory motive and clearly classifies migrants and asylees on their faces.[3]

The Court therefore finds that Plaintiffs have established a substantial likelihood of success with respect to their Section 1981 claim.

### 3.  Title II of the Civil Rights Act

Plaintiffs aver that the Rockland and Orange County EOs deny them equal use and enjoyment of hotels in those counties, in violation of Title II of the Civil Rights Act of 1964 ("Title II").  (See Pls.' Mem. at 23.)  Title II secures the right to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion or national origin." *Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc*., No. 21-CV-5749 (JMW), 2023 WL 2632461, at *9 (E.D.N.Y. Mar. 24, 2023) (citing 42 U.S.C. § 2000a(a)).  "It is well

---

[3]      None of the parties raised the issue of whether Plaintiffs' Section 1981 claim would be barred under the Eleventh Amendment.  The Orange County Defendant does argue that under Section 1983, Plaintiffs have to plead the existence of an official policy, custom, or usage that caused injury (*see* Orange County Opp. at 23), but as the Plaintiffs' correctly argue, the fact that the EOs are prototypical official policies satisfies that requirement.

Upon the Court's review of the relevant case law, the Section 1981 claim is not barred by the Eleventh Amendment as Plaintiff only appears to seek prospective injunctive relief against the Defendants, in their official capacities (*see* AC ¶¶ 11–12). *See Cooper v. New York State Dep't of Mental Health*, No. 01 CIV 943 AGS, 2001 WL 456348, at *2 (S.D.N.Y. May 1, 2001) ("the Eleventh Amendment does not prevent a plaintiff from seeking prospective injunctive relief against government employees acting in their official capacities") (citing *Edelman v. Jordan*, 415 U.S. 651, 664 (1974)).

settled that a plaintiff alleging a violation of section 2000a must allege facts which show [he or she] was deprived of equal use and enjoyment of a covered facility's services and facts which demonstrate discriminatory intent." *Id.* (citing *Macer v. Bertucci's Corp.*, No. 13-CV-2994 (JFB) (ARL), 2013 WL 6235607, at *8 (E.D.N.Y. Dec. 3, 2013) (internal quotation marks and citations omitted)). As the Orange County Defendant points out, courts use the same analysis applicable to Section 1981 claims to Title II claims. *Id.* (citing cases).

Here, it is undisputed that hotels and motels subject to the EOs are places of public accommodation under Title II. 42 U.S.C. § 2000a(b)(1) (defining public accommodation to include hotels, motels, and other establishments that provide lodging to transient guests). As explained above, *see supra* Section III.A.1.a–b, while the record shows that Orange and Rockland counties issued their EOs in part because of concerns with respect to limitations in their resources and establishments of what they consider to be homeless shelters without their prior approval, the EOs also appear to have been issued with discriminatory intent and on their face discriminate against asylees and migrants with respect to their access to the hotels/motels. For these reasons, the Court finds that Plaintiffs have established a substantial likelihood of success on their Title II of the Civil Rights Act claim.

### 4. Due Process Right to Intrastate Travel

Plaintiffs argue that the EOs implicate their fundamental right to move freely within New York, as protected under the Fourteenth Amendment due process clause, by banning transport and housing of migrants within Rockland and Orange Counties. (Pls.' Mem. at 11.)

The "fundamental right to travel within a state" is well established in the Second Circuit. *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008); *Jeffery v. City of New York*, No. 20-CV-2843, 2022 WL 204233, at *5 (E.D.N.Y. Jan. 24, 2022) ("Freedom of movement, which

includes the freedom to travel within a state, is a well-established fundamental right").  Laws and policies that burden the fundamental right to free movement within the state are subject to strict scrutiny. *Williams*, 535 F.3d at 75; *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 648 (2d Cir. 1971) (applying strict scrutiny to a five-year residency requirement for municipal public housing because such law affected a "fundamental right" to travel for individuals arriving from outside of the city); *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (because the curfew in question "limit[ed] the constitutional right to free movement within the [t]own ..., we assume that were this ordinance applied to adults, it would be subject to strict scrutiny.")

To trigger strict scrutiny, there need not be a complete bar to travel, as the right to intrastate travel includes freedom from curtailment of said travel.  *Ramos v. Town of Vernon*, 353 F.3d 171, 176 (2d Cir. 2003) (because the curfew in question "limit[ed] the constitutional right to free movement within the [t]own ..., we assume that were this ordinance applied to adults, it would be subject to strict scrutiny."); *Mem'l Hosp. v. Maricopa Cnty*., 415 U.S. 250, 263–64 (1974) (", to the extent the purpose of the requirement is to inhibit the immigration of indigents generally, that goal is constitutionally impermissible").

Plaintiffs argue that the Rockland County and Orange County EOs explicitly curtail their ability to travel and reside in Rockland and Orange counties, therefore implicating their fundamental right to intrastate travel and triggering strict scrutiny.  The Defendants, however, argue that the migrants and asylum seekers are not barred from traveling to and residing in the county outside of the New York Program.  The Rockland County Defendant states its actions have only been against the New York City program, and its EO has only created a minor restriction on travel.  (Rockland County Opp. at 13–14.). The Orange County Defendant argues that "there is no burden on the right to travel" as its EO is not "forbidding anyone to come or stay in Orange

County." (Orange County Opp. at 20.).  For the reasons articulated below, the Court agrees with Plaintiffs that strict scrutiny is triggered by the EOs because they impede intrastate travel.

The language of the challenged EOs and the Defendant's contemporaneous statements when issuing the EO shows that curtailment of the migrant and asylum seekers' travel was a goal of the EOs.[4]  *See Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351, 362 (S.D.N.Y. 2007), *aff'd*, 308 F. App'x 511 (2d Cir. 2009) ("A statute implicates the constitutional right to travel when it actually deters such travel, or when impedance of travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right.").

The Orange County EO instructs "all hotels, motels, and/or facilities allowing for short-term rentals" not to accept "migrants and/or asylum seekers for housing within Orange County." (Orange County EO.)  The Orange County EO explicitly acknowledges that it was issued in light of its concern that "the locations for which New York City intends to transport said migrants and/or asylum seekers to Orange County have inadequate infrastructure to meet the needs of said individuals . . ." (*Id*.)  Therefore, on its face, the Orange County EO seeks to impede the ability for the migrants and asylum seekers to travel to those Orange County locations. Contemporaneous comments purportedly made by the Orange County Defendant support the finding that curtailing of travel to Orange County was a motive for the EO.  For example, the Orange County Defendant reportedly stated that his order "tells the hotels here do not accept any of these asylum seekers and that's the way it's going to be." (Belsher Decl., Exh. 18).  He also explained further that "I am opposed to these asylum seekers being sent to our communities." (Belsher Decl., Exh. 6.)  For these reasons, strict scrutiny is trigged as to the Orange County EO.

---

[4]      At least one Plaintiff has also declared that it would have been difficult for him to travel and stay in Orange County without the New York City program. (*See* Neira Decl. ¶ 6.)

The Rockland County EO, notably, states that "it shall not be read to have the purpose of barring any person, including migrants or asylum seekers, from traveling to or residing in the County." (Rockland EO at 2.) While it does not bar all travel or residency in the County for migrants or asylum seekers, it is clear that the Rockland County EO does impede travel to the county for the migrants and asylum seekers. The Rockland County EO bars contracts to "transport persons, including but not limited to migrants or asylum seekers to locations in the County, or to house or shelter such persons at locations in the County for any length of time without the municipality obtaining express, written permission of the County Executive." (Rockland County EO, § 1(A)). Moreover, in speaking about the planned relocation of migrants to Rockland County, the Rockland County Defendant reportedly stated, "[w]hatever we need to do to stop this, we will do." (Belsher Decl., Exh. 4.) Accordingly, strict scrutiny is trigged as to the Rockland County EO as well.

The question then becomes—do the Orange and Rockland County EOs pass strict scrutiny? In order to pass strict scrutiny, the Defendants must show that the EOs are narrowly tailored to achieve a compelling governmental interest. *See Five Borough Bicycle Club v. City of New York*, 483 F. Supp. 2d 351, 368 (S.D.N.Y. 2007), *aff'd*, 308 F. App'x 511 (2d Cir. 2009). Plaintiffs argue that Defendants fail to proffer a justification for their EOs that is constitutionally permissible, and therefore there is no compelling governmental interest at stake. (Pls.' Mem. at 14.)

As Plaintiffs persuasively argue, the "compelling government interest" proffered by the Defendants impermissible. The Orange County EO states "[t]he County of Orange is not capable of receiving and sustaining such volume of migrants and asylum seekers that New York City intends to or hereafter does transport to the County, whose presence will spike the number of people in need of government services at all levels of government in the County." (Orange County

EO.)  The Rockland County EO similarly anticipates a "flood" of persons in need of services, which would "worsen" the crisis.  (*See* Rockland County EO.)  While conservation of resources may serve as a legitimate reason for the EO, it may not be pursued with the goal that the community "take care of its own first."  *See King v. New Rochelle Mun. Hous. Auth*., 442 F.2d 646, 649 (2d Cir. 1971) ("Indeed, the justification the Authority advances is similar to the justification the Court found unacceptable in *Shapiro*: that each community should take care of its own first.") (citing *Shapiro v. Thompson*, 394 U.S. 618, 631 (1969)).  And in any event, as described above, *see supra* Section I.A.1.b, the EOs are not narrowly tailored to address Defendants' resources concerns.

For the foregoing reasons, the Court finds that the Plaintiffs have established a substantial likelihood of success on their fundamental right to intrastate travel claim.

**5.  Supremacy Clause**

Plaintiffs argue that the executive orders violate the Supremacy Clause of the U.S. Constitution, because the "[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  (Pls.' Mem. at 21.) (citing *Arizona v. United States*, 567 U.S. 387, 394 (2012)).   Plaintiffs argue that state and local law purporting to regulate the ability of noncitizens to secure housing or travel falls squarely within the preemptive effect of federal law. (Pls.' Mem. at 21.)

During oral argument, counsel for Plaintiffs stated that their Supremacy Clause argument was their strongest.  The Court disagrees.  Based on the cases cited by Plaintiffs, Plaintiffs appear to take an overly broad view of the preemptive effect of the Supremacy Clause, and based on their arguments in their moving papers, they fail to establish a likelihood of success on this claim.

"The pre-emption doctrine is a necessary outgrowth of the Supremacy Clause," which "provides that the laws of the United States 'shall be the supreme Law of the Land ... any Thing

in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Lozano v. City of Hazleton*, 724 F.3d 297, 302 (3d Cir. 2013); U.S. Const, art. VI, cl. 2). Pre-emption may be either express or implied, and implied pre-emption includes both field preemption and conflict pre-emption. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992).

Field pre-emption occurs "[w]hen Congress intends federal law to 'occupy the field.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). "The intent to displace state law altogether can be inferred from a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it' or where there is a 'federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Arizona v. United States*, 132 S.Ct. at 2501 (internal quotation marks and citation omitted).

Conflict pre-emption can occur in two ways: where "compliance with both federal and state regulations is a physical impossibility," or "where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 132 S.Ct. at 2501 (internal quotation marks and citations omitted). Courts must utilize their judgment to determine what constitutes an unconstitutional impediment to federal law, and that judgment is "informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Lozano*, 724 F.3d at 302 (citing *Crosby*, 530 U.S. at 373).

Plaintiffs rely on the argument that because the EOs regulate noncitizens, they are necessarily preempted by federal law.  (Pls.' Mem. at 21.). However, Plaintiffs fail to explain whether the EOs are either conflict or field preempted, and fail to provide any analysis as to the extent in which federal law preempts the challenged EOs.  The cases that Plaintiffs cite to show that the analysis is more nuanced than they suggest.  In the cases that Plaintiffs cite to, the plaintiffs

had argued that the housing ordinances therein conflicted with specific federal harboring laws. *See Villas at Parkside Partners v. City of Farmers Branch, Texas*, 726 F.3d 524, 529–30 (5th Cir. 2013) (finding that criminal offense and penalty provisions of city ordinance that made it unlawful for a landlord to rent an apartment to an unlawfully present non-citizen conflicted with federal immigration law, and therefore was conflict preempted by federal anti-harboring law, 8 U.S.C. § 1324(a)(1)(A)(iii)); *United States v. Alabama*, 691 F.3d 1269, 1285–88 (11th Cir. 2012) (finding that the Alabama statutes which criminalized harboring and transportation of unlawfully present alien conflicted with federal immigration law, 8 U.S.C. § 1324(a)(1)(A)(ii)–(iv), which makes it a federal crime for any person to transport or move an unlawfully present alien within the United States; to conceal, harbor, or shield an unlawfully present alien from detection; or to encourage or induce an alien to come to, enter, or reside in the United States) (internal quotation omitted); *Lozano,* 724 F.3d at 315–19 (finding that housing provisions in city ordinances prohibiting unauthorized aliens from residing in any rental housing within the city constituted an impermissible regulation of residence based on immigration status, which was field preempted by alien harboring laws, and were also conflict preempted because they interfered with the federal government's discretion in deciding whether and when to initiate removal proceedings.)

Here, Plaintiffs fail to identify a particular federal immigration law that comes into conflict with the Rockland and Orange County EOs, nor did they provide a meaningful analysis of field preemption. As such, the Court finds that Plaintiffs have failed to meet their burden of showing a substantial likelihood of success on the merits as to their Supremacy Clause claim.

### B.  Irreparable Harm

"A showing of irreparable harm is essential to the issuance of a preliminary injunction." *Shapiro v. Cadman Towers, Inc*., 51 F.3d 328, 332 (2d Cir. 1995). In order to demonstrate that it

will suffer irreparable harm, a party seeking preliminary injunctive relief "must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005)).

Plaintiffs argue that they will suffer irreparable harm in the absence of a preliminary injunction because (i) Defendants' actions violate Plaintiffs' constitutional rights under the Fourteenth Amendment; and (ii) enforcement of the challenged EOs could result in eviction and homelessness for Plaintiffs.

"In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. "*Gallagher v. New York State Bd. of Elections*, 477 F. Supp. 3d 19, 41 (S.D.N.Y. 2020); *see also Conn. Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."). However, "[b]ecause the violation of a constitutional right is the irreparable harm asserted [ ], the two prongs of the preliminary injunction threshold merge into one" and "in order to show irreparable injury, plaintiff must show a likelihood of success on the merits." *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000).

Here, because Plaintiffs' have established a substantial likelihood of success on the merits with respect to their Equal Protection and Fourteenth Amendment due process right to intrastate travel claims, a presumption of irreparable harm follows. *See DiMartile v. Cuomo*, 478 F. Supp.

3d 372, 385 (N.D.N.Y. 2020) ("the Court finds that the showing Plaintiffs have made as to the likelihood of success on the merits of their equal protection claim merit a presumption of irreparable harm on that basis."), *order vacated, appeal dismissed*, 834 F. App'x 677 (2d Cir. 2021). Because Plaintiffs have established irreparable harm based on the challenged EOs' alleged constitutional violations, the Court need not evaluate whether Plaintiffs' sufficiently alleged that they may face eviction or homelessness, and whether that would also constitute irreparable harm. (*See* Reply at 6.)

### C. Balance of Hardships and Public Interest

Plaintiffs argue that the balance of equities and public interest favors injunctive relief in Plaintiffs' favor. (Pls.' Mem. at 24.) On the other hand, the Rockland County Defendant argues that "340 single men living communally in a hotel in a residential community presumably without transportation, employment or money would not benefit the public. Moreover, when the City stops taking care of them after four months Rockland County's Department of Social Services will be overwhelmed." (Rockland County Opp. at 22.) The Orange County Defendant similarly argues that Orange County's resources will be burdened by the influx of "hundreds, if not thousands" of migrants/asylum seekers. (Orange County Opp. at 17.)

The Court finds that Plaintiffs have satisfied their burden of demonstrating that the balance of equities favors them. "The Second Circuit has concluded that, where a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor despite arguments that granting a preliminary injunction would cause financial or administrative burdens on the Government." *Averhart v. Annucci*, No. 21-CV-383 (NSR), 2021 WL 2383556, at *16 (S.D.N.Y. June 10, 2021) (citing *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018)). As discussed above, Plaintiffs have established a likelihood of

success on several of its claims, including an Equal Protection violation and right to intrastate travel violation.  Because "the public interest lies with enforcing the Constitution," the balance ultimately tips in Plaintiffs' favor.  *P.G. v. Jefferson Cnty., New York*, No. 5:21-CV-388, 2021 WL 4059409, at \*5 (N.D.N.Y. Sept. 7, 2021) (cleaned up).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' application for a preliminary injunction is GRANTED.  The Clerk of the Court is kindly directed to terminate the motions at 12, 53, and 54.

The Court makes clear that the grant of preliminary injunction only applies as to the enforcement of the Rockland and Orange County EOs.  As Plaintiffs have represented during oral argument and in their moving papers, that is the only relief they seek.  As already indicated, the Court's decision herein does not mean to interfere with the temporary restraining orders that are in effect and that were issued in state court proceedings, described above, concerning the interpretation and applicability of state and local laws.

Dated: June 6, 2023
      White Plains, NY

SO ORDERED:

HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE

51