UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SIDI MOUHAMED DIEDE, ADAMA SY,
ABDALLAHI SALEM, MOUHAMED SAID
MALOUM DIN, and JHONNY NEIRA
*on behalf of themselves and a class of all others similarly situated*,

       Plaintiffs,

  -against-

COUNTY EXECUTIVE EDWIN J. DAY *as Rockland County Executive* and COUNTY EXECUTIVE STEVEN M. NEUHAUS *as Orange County Executive*,

       Defendants.
-------------------------------------------------------------x

**23-cv-3954 (NSR)(VR)**

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

**PRELIMINARY STATEMENT**

Rockland County Executive Edwin J. Day and Orange County Executive Steven M. Neuhaus (together, "Defendants"), by and through their undersigned counsel, respectfully move this Honorable Court to dismiss the instant action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Plaintiffs, a putative class of homeless migrants who are (or were) in New York City, brought this action challenging two orders that Defendants issued in early May 2023. Those orders were intended to stop New York City from bussing some of the thousands of homeless persons who have entered the City in recent months to several *de facto* homeless shelters in former Rockland and Orange County hotels. Numerous municipalities across the state have issued similar orders. It is undisputed that in establishing these *de facto* shelters, New York City did not coordinate with either Rockland or Orange County, and made no plans regarding the long-term provision of social services to the homeless persons it was bussing. New York City also ignored numerous state and local laws that regulate the establishment and operation of homeless shelters, an issue currently being litigated in numerous state courts.

Notwithstanding the County orders, New York City bussed at least two of the five named plaintiffs to a hotel in Orange County as planned, where they have resided for approximately three months. This Court subsequently enjoined enforcement of the challenged County orders, which also expired automatically after thirty days by operation of New York's Executive Law.

This action, as pled, is accordingly moot. There is no ongoing case or controversy left to adjudicate; the orders Plaintiffs challenged are now a legal nullity twice over. Their arguments that one or more exceptions to the mootness doctrine apply are addressed below.

As an initial matter, however, several assertions made in opposition to Defendants' pre-motion letter must be addressed.[1] First, Plaintiffs assert that the Counties' new orders, issued after the Court's preliminary injunction, "suffer from similar infirmities" as the original orders. They neglect to actually cite any "infirmities" in the new orders, however, and Plaintiffs have notably declined to amend their complaint as against the new orders, despite having had more than two months to do so.

Second, Plaintiffs theorize that the new orders "raise significant questions about whether the counties are attempting to circumvent this Court's injunction and may necessitate a second motion for preliminary relief." They neglect to explain how, exactly, the new orders purport to "circumvent" the injunction, and their failure to actually make the threatened motion speaks volumes about its "necessity."

Indeed, this theory quickly falls apart upon an actual reading of the new orders, which simply mandate compliance with state laws and regulations—particularly New York's Social Services Law. It should be recalled that the Court's preliminary injunction expressly declined to reach "the interpretation and applicability of state and local laws," and left untouched the various temporary restraining orders issued against New York City in parallel state court actions.

In other words, the new orders do not "circumvent" the Court's injunction; they step cleanly into the state law space the injunction carved out. If Plaintiffs believe the new orders nevertheless violate the United States Constitution, they should amend their complaint to formally assert that claim. Rather than rule on this motion, the Court may simply direct them to do so, as set forth below.

---

[1] These assertions were actually made in the context of Plaintiffs' request for "limited expedited discovery concerning the issuance and intended enforcement of the revised executive orders." Plaintiffs have since revealed that they want discovery concerning the *original* orders—an issue Defendants have raised with the assigned U.S. Magistrate Judge.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### *New York's State of Emergency*

Plaintiffs initiated this action in response to what they describe as "an emergency that does not exist." (Compl. ¶ 2.) But two days prior, Governor Kathy Hochul had declared an emergency for the entire State of New York, noting that "local governments within the State … lack the infrastructure, facilities, and resources necessary to meet the immediate humanitarian demand to house and meet other basic needs of the large numbers of homeless arrivals." (*See* Declaration of David H. Chen (hereafter "Chen Decl."), Ex. A.) She further noted that:

> the arrival of increased numbers of migrants seeking shelter in the City and State of New York is expected to exacerbate an already large-scale humanitarian crisis and create a disaster emergency to which local governments are unable to adequately respond, creating a threat to health and safety, which could result in the loss of life or property[.]

(*Id.*) Accordingly, Governor Hochul found "that a disaster is imminent for which the affected local governments are unable to respond adequately." (*Id.*) The Governor's Executive Order suspended or modified portions of New York's State Finance, Public Building, Economic Development, General Municipal, Multiple Dwelling, and Real Property & Proceedings Laws, but did not suspend or modify any portions of New York's Social Services Law. (*See id.*) Governor Hochul extended the State Disaster Emergency (and the suspensions/modifications of the aforementioned laws) on May 27th, June 26th, and most recently on July 26, 2023.[2]

On October 7, 2022, more than seven months before Plaintiffs filed this action, New York City Mayor Eric Adams had similarly declared a state of emergency "based on the arrival of thousands of individuals and families seeking asylum." Mayor Adams has continuously extended this state of emergency for New York City ever since, most recently on August 13,

---

[2] These extensions, and the Governor's underlying Executive Order, are all a matter of public record and are available at: https://www.governor.ny.gov/executiveorders.

2023.[3] (*See* Chen Decl. Ex. B.) In so doing, Mayor Adams noted that "over the past several months, thousands of asylum seekers have been arriving in New York City, from the Southern border, without having any immediate plans for shelter," and further noted that "the City now faces an unprecedented humanitarian crisis that requires it to take extraordinary measures to meet the immediate needs of the asylum seekers while continuing to serve the tens of thousands of people who are currently using the DHS Shelter System." (*Id.*)

In other words, contrary to Plaintiffs' assertions (Compl. ¶ 2), there are in fact "thousands" of homeless migrants and/or asylum seekers in New York, and this is in fact an "emergency," as a matter of law. Plaintiffs assert that there are no "large-scale plans for migrants to move" from New York City to other counties in the state (*id.*), but this is also demonstrably untrue, as shown by a recent letter from Governor Hochul's counsel to the New York City Law Department. (Chen Decl. Ex. C.) This letter confirms that "the State continues to coordinate with counties and local officials to facilitate the temporary shelter of migrants outside of the City." (*Id.* at 9.) It also highlights several "legal and practical constraints" with this plan, to wit:

- The State has no legal authority to extend the City's obligation to provide Shelter under the Consent Decree to other counties and localities that are not signatories to the Consent Decree.

- Many migrants will not willingly move outside of the City, and the State will not sanction a policy of involuntarily relocating individuals or families within or beyond State borders. As one example of the negative impacts of such efforts, on August 7, 2023, the City sent a bus of 77 individuals to Rochester, New York, and 30 of those individuals refused to get off the bus and returned to the City.

- Under federal law, asylum seekers must apply to change venue to move outside of the City. Filing this application to change venue pauses the federal 180-day

---

[3] The Mayor's October 7, 2022 order and the subsequent extensions thereof are similarly a matter of public record, and are available at: https://www.nyc.gov/office-of-the-mayor/news.page.

- waiting period between when asylum seekers submit their applications for asylum and when they may apply for work authorization. Relocation can therefore further delay migrants' ability to work and obtain self-sufficiency.

- Finally, in most instances, the City can more effectively provide these individuals and families with essential services, such as public transportation, social services, youth programming, and healthcare.

(*Id.*) Importantly, the letter from the Governor's counsel also noted that:

> A lack of coordination from the City to date has impeded the State's ability to foster productive relationships and discussions, including with the counties and localities that have offered to help. ***In particular, the City chose to send migrants to counties and localities outside of the City with little-or-no notice to or coordination with the State or those counties and localities.*** That has created opposition and has led to litigation that might have been mitigated or avoided if the City had acted in concert with the State and with the counties and localities where it sent migrants. Moreover, the City's failure to inform the State of critical incidents that have occurred in shelters outside of the City has compounded these difficulties.

(*Id.* at 9-10 (emphasis added).)

### *The Underlying Complaint and the Challenged Executive Orders*

The instant lawsuit does not even mention, let alone challenge, the New York State or New York City orders. It only challenges two executive orders dated May 6, 2023 (Rockland County) and May 8, 2023 (Orange County), which were attached to the Complaint as Exhibits 1 and 2, respectively. Both orders were only in effect for thirty days and have long since expired.

The challenged Rockland County order directly quoted New York City's orders in noting that "over the past several months, thousands of asylum seekers have been arriving in New York City, from the Southern border, without having any immediate plans for shelter," and "the City now faces an unprecedented humanitarian crisis that requires it to take extraordinary measures to meet the immediate needs of the asylum seekers while continuing to serve the tens of thousands of people who are currently using the NYS DHS Shelter System." (*Compare* Compl. Ex. 1 *with* Chen Decl. Ex. B.)

5

The challenged Rockland County order also noted that "there is no reason to believe that these migrants or asylum seekers will leave [Rockland] County after New York City ceases to pay for the housing and any services they are presently receiving" (Compl. Ex. 1)—an assertion that none of the Plaintiffs dispute.  It further noted that Rockland "is already a cosmopolitan, diverse County, with people of many backgrounds and identities, that freely helps all in need with programs for both documented and undocumented migrants," but that, with "less than one tenth the population of New York City," Rockland is "not capable of receiving and sustaining the volume of migrants and asylum seekers that New York City intends to send over, whose presence will spike the number of people in need of government services[.]"  (*Id.*)

The challenged Orange County order asserted what the recent letter from the Governor's counsel to New York City (*see* Chen Decl. Ex. C, at 9-10) confirmed:

> Mayor Adams has represented to Orange County officials that approximately only 60 adult male migrant and/or asylum seekers will be transported to Orange County. However, Orange County has since learned that the Adams administration has also sought to house additional hundreds of migrants and/or asylum seekers at additional locations without notifying Orange County, and as a result Orange County can no longer rely on the representations of New York City officials[.]

(Compl. Ex. 2.)  The challenged Orange County order further asserted that: "[t]he County of Orange is not capable of receiving and sustaining such volume of migrants and asylum seekers that New York City intends to or hereafter does transport to the County, whose presence will spike the number of people in need of government services at all levels of government in the County;" "all temporary housing shelter beds in Orange County are currently at maximum capacity and cannot accommodate additional homeless individuals;" and "the locations for which Mayor Adams intends to transport said migrants and/or asylum seekers have inadequate infrastructure to meet the needs of said individuals, including but not limited to transportation to work, food, medical care, and pharmaceutical opportunities."  (*Id.*)

6

Plaintiffs do not dispute, or even address, any of these facts. Instead, they condemn what they call "racist" remarks by Defendants (Compl. ¶ 1), without specifying which remarks were "racist" or how so. Plaintiffs do not actually plead their race or national origin, claiming only that they are "migrant[s] who recently arrived in the United States." (*Id*. at ¶¶ 5-8.) According to the Complaint, "at least two of the plaintiffs traveled by bus to the Crossroads Hotel in Newburgh and were allowed to enter." (*Id*. at ¶ 3.) Notably, those two persons, together with the other 184 homeless persons bussed to The Crossroads Hotel and another hotel in Orange County, were all permitted to remain by a temporary restraining order issued in *County of Orange v. The Crossroads Hotel et al.*[4] All 186 homeless persons bussed to Orange County, including the two plaintiffs, were also permitted to remain by the preliminary injunction issued in *County of Orange et al. v. City of New York et al.*, which is currently in effect.[5]

To date, TROs and/or preliminary injunctions have been issued against New York City's plan to bus migrants to *de facto* homeless shelters outside the City by state courts in Orange, Rockland, Dutchess, and Onondaga Counties. The New York County Supreme Court recently rejected the City's attempt to consolidate all of the pending state cases in Manhattan.

### *Subsequent Executive Orders and the Court's Preliminary Injunction*

Both of the challenged orders were issued pursuant to Section 24 of the New York State Executive Law, which states, in relevant part, that such orders "shall remain in effect for a period not to exceed thirty days[.]" N.Y. EXEC. LAW § 24(1). Accordingly, the Rockland County order automatically expired on June 5th (*see* Compl. Ex. 1) and the Orange County order automatically

---

[4] (*See* Orange Cty. Sup. Ct. Index No. EF003107-2023, NYSCEF Doc. No. 16.) That case was removed to federal court and marked related to the instant case. (*See generally* No. 23-cv-4213 (NSR)). Orange County's motion to remand it back to state court is currently pending.

[5] (*See* Orange Cty. Sup. Ct. Index No. EF003109-2023, NYSCEF Doc. No. 75.) That case was not removed and is currently in discovery; the injunction has been appealed to the Appellate Division.

expired on June 7th (*see* Compl. Ex. 2.) In between those dates, on June 6, 2023, the Court issued a preliminary injunction ("PI"). (ECF # 55.) The PI enjoined enforcement of both challenged orders, without "interfere[ing] with the temporary restraining orders that are in effect and that were issued in state court proceedings … concerning the interpretation and applicability of state and local laws."

As set forth in their pre-motion letter (ECF # 59), both Defendants subsequently issued new orders, dated June 7th (Orange) and June 14th (Rockland).[6] To comply with the PI, both focused on New York's Social Services Law, which has not been suspended or modified by the Governor's emergency declarations. Specifically, Orange County "[o]rder[ed] that all hotels, motels and/or any facilities allowing short term rentals do not accept individuals transported to Orange County in violation of Social Services Law § 62 and related Administrative Directives[.]" (Chen Decl. Ex. D.) Rockland County similarly ordered that no other municipality "may establish a shelter or temporary housing in Rockland County without adhering to the requirements of all applicable statutes, laws, regulations, and rules of the United States of America, New York State, the County of Rockland and any affected municipality … including but not limited to NYS Social Services Law Art. 2-A and Art. 3 Titles 1 and 2[.]" (Chen Decl. Ex. E.)

Orange County's new order additionally noted that New York City "represented that it will only pay for such shelter up to a limited date and has no long-term solution for housing their homeless within the County, which is in violation of New York State Social Services Law and related Administrative Orders pertaining thereto," and that "all temporary housing shelter beds in

---

[6] Orange County's Executive Orders are a matter of public record and are available at: https://www.orangecountygov.com/1467/Executive-Orders. Rockland County's Executive Orders are similarly a matter of public record and are available at: https://rocklandgov.com/departments/county-executive/.

Orange County are currently at maximum capacity and cannot accommodate additional homeless individuals." (Chen Decl. Ex. D.) Rockland County's new order noted that:

> this County presently lacks sufficient low-income housing to absorb people that the City wants to send here, then abandon after four months. The New York State Comptroller has reported that Rockland County has had the largest share of rental households paying housing costs over the affordability threshold.
>
> Rockland takes responsibility for the people who live here and who come here, as required by section 62 of the NYS Social Services Law.  By the same law, New York City has a legal responsibility to provide for the welfare of the indigent that arrive within its borders.  By the current program, New York City is illegally trying to export its issues to Rockland County.
>
> Section 62 states that, as a matter of law, 'each public welfare district shall be responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which he is unable to provide for himself.'  New York City is one such social service district and is consequently responsible for the assistance and care of any person who resides or is found in its territory and who is in need of public assistance and care which they are unable to provide for themselves.
>
> Proper planning and a recognition that the County does not have the resources to take on the City's burden will only come through cooperation from and communication with the City.  Cooperation between New York City and the County, rather than the City's unilateral deportation of its impoverished charges, is critical.
>
> In addition, the County is quite sensitive to issues of discrimination. As such, to deter any such discrimination with respect to the issues presented to the County and addressed by this Order, it is prohibited for any municipality to engage in discriminatory acts within the County regarding the operation of any government program.

(Chen Decl. Ex. E.)

The two June orders (Chen Decl. Exs. D and E) have themselves now automatically expired by operation of New York's Executive Law.  Accordingly, Orange County issued new, identical orders on July 6th and, most recently, August 5th.  (*See* Chen Decl. Exs. F, G.) Rockland County, in lieu of issuing new-but-identical orders, has renewed its June 14th order on a regular basis, most recently on August 16th.  (*See* Chen Decl. Ex. H.)

9

## LEGAL STANDARDS

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990).

> Article III denies federal courts the power to decide questions that cannot affect the rights of litigants in the case before them, and confines them to resolving real and substantial controversies admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Id.*; *see Fox v. Board of Trustees of the State Univ.*, 42 F.3d 135, 139-40 (2d Cir. 1994) ("the exercise of judicial power depends upon the existence of a case or controversy").

"When a case becomes moot, the federal courts lack subject matter jurisdiction over the action." *Fox*, 42 F.3d at 140 (citation and internal quotation marks omitted). "It is not enough that a dispute was very much alive when suit was filed." *36 Apt. Assocs., LLC v. Cuomo*, 860 F. App'x 215, 216 (2d Cir. 2021). Rather, "[t]he parties must continue to have a personal stake in the outcome of the lawsuit." *Lewis*, 494 U.S. at 478; *see also Fox*, 42 F.3d at 140 ("A case is moot, and accordingly the federal courts have no jurisdiction over the litigation, when the parties lack a legally cognizable interest in the outcome") (citation omitted).

While there is an exception to the mootness doctrine for cases "capable of repetition yet evading review," it "applies only in exceptional situations, where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Marciano v. Adams*, No. 22-570-cv, 2023 U.S. App. LEXIS 11915, at *3 (2d Cir. May 16, 2023) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016)). The mere "speculation" or "theoretical possibility" that one might be subject to a similar action in the future "does not rise to the level of a reasonable expectation or demonstrated probability of

10

recurrence," such that this rare exception applies. *Marciano*, 2023 U.S. App. LEXIS 11915, at *3 (quoting *Exxon Mobil Corp. v. Healey*, 28 F.4th 383, 396 (2d Cir. 2022)).

## **ARGUMENT**

I. **This action should be dismissed for lack of subject matter jurisdiction because Plaintiffs' claims—which only challenged Defendants' May 2023 orders—are now moot.**

In their opposition to Defendants' pre-motion letter, Plaintiffs do not contest the fact that the May 2023 orders are no longer in effect. (*See generally* ECF # 63.) Instead, they argue that two exceptions to the well-established mootness doctrine should apply to keep this lawsuit alive, notwithstanding that any ruling on those orders' constitutionality would be purely academic.

First, Plaintiffs argue that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (ECF # 63, at 2.) The Second Circuit thoroughly examined this mootness exception in *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105 (2d Cir. 2016). That case involved a lawsuit by AFDI, "a pro-Israel advocacy organization known for its criticism of Islam," which wanted to display "a menacing-looking" Muslim man on the back of MTA busses. *Id.* at 108. When their proposal was rejected, AFDI sued on First Amendment grounds and successfully moved for a PI. *Id.* The MTA quickly amended its advertising standards and rejected the ad based on these new standards, leading the district court to dissolve its own injunction as moot. *Id.* On appeal, AFDI argued (as Plaintiffs do here) that "the MTA's new advertising policy was just as unconstitutional as the one already enjoined." 815 F.3d at 108. The Second Circuit disagreed, holding that while AFDI "is, of course, free to challenge the MTA's new advertising standards," "it must do so through an amended complaint." *Id.* at 111. (*See* Part II, *infra*.)

11

The Second Circuit also noted that a threshold inquiry is "whether the challenged conduct has, in fact, ceased." *Id.* at 109 (citation omitted).  Here, of course, it never even began—as Plaintiffs concede, "at least two" of them "traveled by bus to the Crossroads Hotel in Newburgh and were allowed to enter" (Compl. ¶ 3), and the Court enjoined enforcement of the May 2023 orders shortly thereafter.  To the extent any other plaintiff was prevented from taking up residence in one of New York City's *de facto* homeless shelters, it was by operation of one of the various state court TROs or injunctions.

Another threshold inquiry "is whether the defendant's conduct has been sufficiently altered so as to present a substantially different controversy from the one that existed when suit was filed." *Am. Freedom Def. Initiative*, 815 F.3d at 109.  Here, it clearly has.  The Court enjoined the original, May orders on the grounds that they "broadly bar transport and housing for any migrant or asylum seekers regardless of whether those individuals will stay beyond the four-month period, and regardless of whether the migrants or asylum seekers actually anticipate seeking social services."  The new orders, in stark contest, do not target "migrants," "asylum seekers," or even homeless persons; they narrowly target the establishment of homeless shelters that violate New York's Social Services Law and the regulations promulgated thereunder.

The Second Circuit also inquired as to whether there was "a reasonable expectation that the alleged violation will recur," and found there was not, because the MTA had declined to appeal the district court's preliminary injunction. *Am. Freedom Def. Initiative*, 815 F.3d at 110.  The same occurred at bar; Defendants' time to appeal the Court's PI has long since run.

Finally, the Circuit found that the interim relief granted by the district court "irrevocably eradicated the effects of the alleged violation," noting that "any restriction on AFDI's speech at this time is a consequence of the MTA's new advertising policy, not a relic of its old one." *Id.*

Here, too, the interim relief granted by the Court ensures that any restriction on Plaintiffs' ability to reside in an *ad hoc* shelter created by New York City would be a consequence of the new orders, not the enjoined orders. In fact, it would be consequence of the Rockland County TRO and/or Orange County PI that the Court expressly left in place.

Plaintiffs next argue that an exception to the mootness doctrine applies because the challenged action is "capable of repetition, yet evad[es] review." (ECF # 63, at 3.) But the Court's June 6th PI demonstrates that the original orders did ***not*** "evade review." The concern that the "duration of the counties' orders is too short to be fully litigated" (*id.*) is satisfied by the fact that the ***current*** orders have remained unchanged (via repeated extensions) since June. Plaintiffs' vague reference to Defendants' "continued efforts to prevent the relocation of migrants and asylum seekers to their counties" is belied by their months-long failure to actually identify any such "efforts." (*Id.*)

*Lloyd v. City of New York*, 43 F. Supp. 3d 254 (S.D.N.Y. 2014), cited by Plaintiffs, is inapposite. In that case, the City had asserted mootness because none of the plaintiff inmates was just then incarcerated on Rikers Island. The district court rejected this argument in part because "there is some reason to believe that these Plaintiffs—both of whom testified that their many brushes with the law had led to a considerable number of confinements on Rikers—may someday return [there], where they will find themselves subject to the same condition of which they here complain." *Id.* at 270. No such possibility exists here; the "conditions" are enjoined.

Far more on point is this Court's own recent decision in *Highview Props. D.H.F. Inc. v. Town of Monroe*, 606 F. Supp. 3d 5 (S.D.N.Y. 2022). In that case, the plaintiff brought a constitutional challenge against the Town of Monroe, New York based on a temporary moratorium against certain land subdivisions, arguing that the intent behind the moratorium was discriminatory. The Court dismissed the declaratory judgment claims as moot because the moratorium, like the Defendants' original executive orders here, had expired by its own terms.

13

*See id.* at 25-26.  Plaintiffs try to distinguish *Highview* on the ground that only "this Court's order … prevents the counties from re-enacting their prior orders." (ECF # 63, at 3.)  But "this Court's order" is precisely the point.  As the Second Circuit held in *Am. Freedom Def. Initiative*, PIs such as the one the Court issued in June can be entirely dispositive regarding the mootness issue, especially where, as here, the party arguing mootness declines to appeal the PI.  *See* 815 F.3d at 110.  Stated differently, Plaintiff's underlying claims have been mooted by their own success in obtaining a PI at the outset of litigation.

II.     **In the alternative, Plaintiffs should be directed to amend their complaint, particularly given the serious questions of standing they themselves have conceded.**

The Court need not reach the foregoing arguments, and need not even wait until this motion is fully briefed.  Instead, it can direct Plaintiffs to amend their complaint to address the current orders.  Defendants will not raise any mootness arguments in that eventuality, alleviating Plaintiffs' concern about having to continuously amend going forward.  (*See* ECF # 63 at 3 n.2.)

It is worth noting that when Magistrate Judge Reznik asked Plaintiffs' counsel, during an August 18th discovery conference, why they had not amended their complaint to address the new orders, they could not articulate a response beyond the assertion that the new orders "suffer from similar infirmities as they did at the outset." (ECF # 63 at 3.)  If Plaintiffs have actually been injured in some way by the new orders, they should affirmatively allege how.

Indeed, injury is an essential element of standing, *see Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58, 62 (2d Cir. 2021), and it is Plaintiffs' burden to establish standing via affirmatively and plausibly alleged facts.  *See Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  At least two of the Plaintiffs were demonstrably ***uninjured***, even by the original May orders—Plaintiffs concede in their pleadings that "at least two of the [five] plaintiffs traveled by bus to the Crossroads Hotel in Newburgh ***and were allowed to***

14

*enter*."  (Compl. ¶ 3 (emphasis added).)  As previously noted, the state court's preliminary injunction has allowed them to remain.  It is unclear whether the other Plaintiffs are still in New York City, or whether they have been bussed to some other municipality.

All of this weighs in favor of directing Plaintiffs to amend.  The crucial issue of whether any of the Plaintiffs even allege a cognizable injury that was caused by Defendants should be addressed before class certification is adjudicated, before this motion is fully briefed, and certainly before any further discovery occurs.  *Cf. Doe v. Immigration & Customs Enforcement*, No. M-54 (HB), 2006 U.S. Dist. LEXIS 28300, at *9 (S.D.N.Y. May 10, 2006) (noting that while it was "unfortunate" that standing was only raised after various other issues had been adjudicated, the issue of standing "is never waived" because it is "a jurisdictional prerequisite in federal courts").  Proceeding otherwise would be the height of judicial inefficiency.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that their motion to dismiss this action should be GRANTED.  In the alternative, Defendants respectfully submit that Plaintiffs should be directed to file an amended complaint, and that all pending discovery and motion practice should be stayed in the interim.

Dated:  August 21, 2023

BLEAKLEY PLATT & SCHMIDT, LLP
One North Lexington Avenue
White Plains, New York 10601
*Counsel for Defendants*

by:  /s/ *David H. Chen*
David H. Chen, Esq.
Vincent W. Crowe, Esq.
Matthew G. Parisi, Esq.
Tel.: (914) 287-6155
Fax: (914) 683-6956
E-mail: dchen@bpslaw.com